CADY, Chief Justice.
In this appeal, we consider the constitutionality of a warrantless search of the home of a parolee by a parole officer that uncovered evidence used to prosecute and convict the parolee of the crime of possession of a controlled substance as a habitual offender. We must determine whether the search was unconstitutional or was justified by the special needs of the State, based on a balancing of the governmental interests served by the search against the privacy interest of the parolee protected under article I, section 8 of the Iowa Constitution. On our review, we find the search by the parole officer did not violate article I, section 8 of the Iowa Constitution. We affirm the judgment and sentence of the district court.
I. Background Facts and Proceedings.
Donald King was released on parole from a correctional institution in Iowa on June 28, 2012. He was serving a sentence of incarceration at the correctional institution after being convicted of the crimes of possession of a controlled substance (methamphetamine), possession of a controlled substance (methamphetamine) with intent to deliver, and theft in the second degree. The parole officer assigned to supervise King while on parole was Emmanuel Scar-mon. As a condition to his release, King was required to sign a “Parole Order and Agreement.” The agreement contained numerous terms, including a consent-to-search provision and an agreement to abstain from the use, purchase, and possession of any drug.
King moved into an apartment in Sioux City and found employment. In September and October 2012, however, he tested positive for methamphetamine. He was placed into an inpatient drug-treatment program and returned to his apartment upon completing the program on January 4, 2013. King was required to continue the drug-treatment program on an outpatient basis, and he was required to find employment. He was also required to wear an electronic monitoring bracelet, which would allow his probation officer to track his movements.
On January 14, Scarmon met with King at the probation office. During the meeting, King complained about the outpatient treatment program and seemed to be losing his motivation to succeed at parole. He expressed the notion that it might be easier to return to prison. In the days following the meeting, the monitoring system signaled that King had not left his apartment for two days. King was required to attend drug treatment and to look for employment during this time. The monitoring system also signaled that the bracelet might have been subjected to tampering. Scarmon was concerned that King was on the verge of another relapse into drugs or might abscond from parole.
On January 17, Scarmon and another parole officer, Todd Hruska, made a home visit to check on King. When Scarmon and Hruska arrived at the apartment, King was present and allowed them inside. King lived alone. Scarmon checked the monitoring bracelet worn by King. It did not show any signs of tampering. Scar-mon then administered a breath test to determine if King had been consuming alcoholic beverages. The test did not de *110 tect the presence of any alcohol. King explained that he had not left his apartment over the last few days because he had been sick.
Scarmon had learned from experience that he could not always trust parolees to provide honest answers to his questions. The search provision in the parole agreement was a means for him to help verify if the information provided to him by parolees was correct. He also utilized home searches to make sure parolees were generally living in an environment consistent with the goal of rehabilitation when questions and concerns would surface during the course of supervision. A search was an effective means to discover signs of inappropriate activity that could hamper the success sought by parole.
Scarmon decided he should check King’s bedroom for signs of any activity detrimental to parole, including the presence of drugs or drug paraphernalia. He was aware of King’s history of drug use, including intravenous use of drugs and drug use while on parole. After Scarmon informed King of his intention to search, King did not refuse, but instead led the parole officers to his basement bedroom. Scarmon promptly observed a sunglasses case located on the headboard of the bed. He opened the case and discovered two small bags of marijuana and rolling papers. Scarmon arrested King for violating his parole. Hruska placed a call to the police.
King was subsequently charged with one count of possession of marijuana, third offense, a class “D” felony, as a habitual offender. This charge was based on the marijuana found in his bedroom by Scar-mon. King moved to suppress the marijuana as evidence in the prosecution. He claimed the search of his bedroom and sunglasses case violated article I, section 8 of the Iowa Constitution, and his consent to the search under the parole agreement did not constitute a waiver of his constitutional right. The State resisted the motion. It argued the search was valid either as a “special needs” search or as a “consent” search under the parole agreement. The district court overruled the motion, ultimately ruling that the search was supported under the special-needs doctrine.
At a bench trial, King was convicted of possession of a controlled substance, marijuana, third offense, as a habitual offender. The district court sentenced King to a period of incarceration not to exceed fifteen years. The sentence was suspended, and King was placed on probation for two years. King -appealed the judgment and sentence based on the denial of his motion to suppress.
II. Standard of Review.
We review de novo claims based on the district court’s failure to suppress evidence obtained in violation of the state constitution. State v. Kern, 831 N.W.2d 149, 164 (Iowa 2013).
III. Analysis.
Article I, section 8 of the Iowa Constitution expresses “[t]he right of the people to be secure ... against unreasonable seizures and searches,” and requires warrants to be particularized and issued only upon probable cause. Iowa Const, art. I, § 8 (emphasis added). The federal counterpart to Iowa’s right is found in the Fourth Amendment to the United States Constitution. U.S. Const, amend. IV (“The right of the people to be secure ... against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause.... ”). The text of both provisions applies its protection to all people, including people who may be detached totally from any suspicion of criminal behavior, although the right is most often applied in *111 the law to people suspected of engaging in criminal behavior.[1] See United States v. Verdugo-Urquidez, 494 U.S. 259, 265-66, 110 S.Ct. 1056, 1060-61, 108 L.Ed.2d 222, 232-33 (1990) (examining the meaning of “the people” in the context of Fourth Amendment protections); Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967) (“[T]he Fourth Amendment protects people, not places.”). Overall, the right protects people against warrantless searches, with carefully crafted exceptions.
The declaration of the right in the context of its ownership by the people projects a powerful statement. It identifies the importance of the right to our founders and the prominence of the right in society. See Boyd v. United States, 116 U.S. 616, 624-35, 6 S.Ct. 524, 529-35, 29 L.Ed. 746, 749-52 (1886) (describing in detail the development of the right and its importance to the founders), abrogated on other grounds by Warden v. Hayden, 387 U.S. 294, 301-02, 87 S.Ct. 1642, 1647, 18 L.Ed.2d 782, 788-89 (1967). Yet, the thrust of the right does not speak in absolutes, but reason. See State v. Naujoks, 637 N.W.2d 101, 107 (Iowa 2001) (“The essential purpose of the Fourth Amendment ‘is to impose a standard of “reasonableness” upon the exercise of discretion by government officials ....”’ (quoting State v. Loyd, 530 N.W.2d 708, 711 (Iowa 1995))). This approach permits the reasonableness of searches to adapt over time to new challenges given to the people and government that were not contemplated at the time the provision was framed. It allows the right to take on a new shape over time in response to new understandings of those times when government is permitted to conduct a reasonable search, including the search of people or places for purposes primarily unrelated to the enforcement of criminal laws. See, e.g., New Jersey v. T.L.O., 469 U.S. 325, 335-36, 105 S.Ct. 733, 739-40, 83 L.Ed.2d 720, 730-31 (1985) (examining the reasonableness of warrantless school searches). These future circumstances can both expand the types of warrantless searches permitted by the right, just as it could diminish the number or type of exceptions over time. See State v. Cline, 617 N.W.2d 277, 283 (Iowa 2000) (declining to adopt a good-faith exception to the exclusionary rule under the Iowa Constitution), overruled on other grounds by State v. Turner, 630 N.W.2d 601, 606 n. 2 (Iowa 2001). Over approximately the last fifty years, new needs of the government to conduct war-rantless searches primarily unrelated to law enforcement have challenged the shape of the right through what has become known as the special-needs doctrine. See T.L.O., 469 U.S. at 332-33 & n. 2, 340-41, 105 S.Ct. at 737-38 & n. 2, 742, 83 L.Ed.2d at 728-29 & n. 2, 734.
*112 A. Special-Needs Doctrine. The special-needs doctrine first surfaced under our federal jurisprudence in Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). In Camara, the Court articulated a test to determine if and for what reason a warrant would be needed for an administrative search. Id. at 532-33, 539-40, 87 S.Ct. at 1732-33, 1736, 18 L.Ed.2d at 937-38, 941 (finding a warrant was only necessary when entry of inspectors was refused in order to inform the homeowner of the limits of the search, that the inspector was authorized, and the necessity of the search to enforce the municipal code). Camara was followed by T.L.O., 469 U.S. at 340-42 & n. 7, 105 S.Ct. at 742-43 & n. 7, 83 L.Ed.2d at 733-35 & n. 7, in which the Court applied a special-needs test to determine if public school officials needed a warrant to conduct searches of school lockers. The doctrine derived its name from the concurring opinion of Justice Blackmun, who stated: “Only in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable, is a court entitled to substitute its balancing of interests for that of the Framers.” Id. at 351, 105 S.Ct. at 748, 83 L.Ed.2d at 741 (Blackmun, J., concurring in judgment).
In Griffin v. Wisconsin, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), the Court considered the special-needs doctrine in the context of a probationary search. In doing so, the basic application of the doctrine surfaced for the first time. See Griffin, 483 U.S. at 873, 107 S.Ct. at 3168, 97 L.Ed.2d at 717. The Court acknowledged that “[a] probationer’s home, like anyone else’s, is protected by the Fourth Amendment’s requirement that searches be ‘reasonable.’ ” Id. On the other hand, it recognized that “a State’s operation of a probation system ... presents ‘special needs’ beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements.” Id. at 873-74, 107 S.Ct. at 3168, 97 L.Ed.2d at 717. The conditions placed on the liberty of probationers “are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer’s being at large,” which requires and justifies the exercise of supervision to ensure the conditions of probation are followed. Id. at 875, 107 S.Ct. at 3169, 97 L.Ed.2d at 718. The Court ultimately held that requiring a warrant would remove supervisory power from the probation officer and place it in the warrant judge, interfere with quick responses to violations, and reduce the deterrent effect that the searches would create. Id. at 876, 107 S.Ct. at 3170, 97 L.Ed.2d at 719. Even the dissent found probation supervision fell within a special-needs category to justify the examination of the reasonableness of probation-related searches and ultimately concluded the threshold probable-cause requirement for a warrant should be lowered because supervision advances rehabilitation “by allowing a probation agent to intervene at the first sign of trouble.” Id. at 881-83, 107 S.Ct. at 3172-73, 97 L.Ed.2d at 722-24 (Blackmun, J., dissenting). Justice Blackmun observed that the probation officer monitors compliance with the conditions placed on the probationer’s liberty and that a search of the hpme for violations may be necessary to ensure that compliance. Id. at 883, 107 S.Ct. at 3173, 97 L.Ed.2d at 723. He concluded the special-needs doctrine should not apply in Griffin’s case because the search of his home was not a normal probation search, but involved a tip from police to uncover evidence of a new criminal violation; therefore, Griffin’s status as a probationer should not justify the special exception. *113 Id. at 885, 107 S.Ct. at 3174, 97 L.Ed.2d at 725.
In 1989, the Court extended the special-needs doctrine to cover drug testing by railroads pursuant to federal regulations in Skinner v. Railway Labor Executives’ Ass’n, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). These tests were permitted when specific rules were violated or a supervisor had a reasonable suspicion based on specific observations that the employee was under the influence of alcohol.[2] Id. at 611, 109 S.Ct. at 1410, 103 L.Ed.2d at 655-56 (citing 49 C.F.R. § 219.301(b) (1987)). The Court held the government had an interest in regulating railroad employee conduct to ensure safety for both the traveling public and the employees, and this interest presented a special need beyond normal law enforcement that might justify a departure from the warrant requirement. Id. at 620-21, 109 S.Ct. at 1415, 103 L.Ed.2d at 661-62. The Court found the standardized nature of the tests, the minimal discretion of administering them, and the practical difficulties of . railroad supervisors obtaining a warrant from a magistrate while evidence dissipates all weighed against the necessity of requiring a warrant. Id. at 622-24, 109 S.Ct. at 1416-17, 103 L.Ed.2d at 663-64. The Court noted that although other cases indicated a warrantless search must be based on probable cause or at least “ ‘some quantum of individualized suspicion,’ ” if the privacy interests are minimal then the search might be reasonable even absent such suspicion. Id. at 624, 109 S.Ct. at 1417, 103 L.Ed.2d at 664 (quoting United States v. Martinez-Fuerte, 428 U.S. 543, 560, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116, 1130 (1976)). The reasonable expectations of privacy of employees were found to be diminished because the employees worked in an industry that was highly regulated to ensure the safety of everyone. Id. at 627, 109 S.Ct. at 1418, 103 L.Ed.2d at 666.[3]
Safety was again the paramount concern of the Court in National Treasury Employees Union v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). The search in Von Raab involved testing by the Customs Service for drug use among three groups of employees: those directly involved in drug interdiction, those carrying firearms, and those handling classified material. Id. at 660-61, 109 S.Ct. at 1388, 103 L.Ed.2d at 699. The program was designed for deterrence and could not be used in criminal prosecution without consent from the tested employee, setting it outside the needs of normal law enforcement and within the special-needs test.' Id. at 666, 109 S.Ct. at 1391, 103 L.Ed.2d at 702. The Court found the imposition of the warrant requirement would bring normal or routine employment decisions to a constitutional magnitude and could compromise the mission of the Customs Service if warrants were needed without providing any additional protection to personal privacy of *114 the employees.[4] Id. at 666-67, 109 S.Ct. at 1391, 103 L.Ed.2d at 702-03. Further, the Court found the government’s need to conduct the searches outweighed the privacy interests of those who carried firearms and engaged in drug interdiction, but the need did not clearly outweigh the privacy interests of those handling classified information. Id. at 668, 678, 109 S.Ct. at 1392, 1397, 103 L.Ed.2d at 704, 710. The Court reasoned that drug use by agents whose job was to prevent drugs from entering the country might create a conflict of interest that would interfere with the successful execution of their duties and that those customarily using firearms could not risk impaired perception or judgment caused by drug use. Id. at 670-71, 109 S.Ct. at 1393, 103 L.Ed.2d at 705. However, the Court found no evidence whether those with access to “classified” information actually had access to sensitive information that might merit the mandatory testing and could not find the overly broad category reasonable. Id. at 678, 109 S.Ct. at 1397, 103 L.Ed.2d at 710. The dissent acknowledged that “whether a particular search has been ‘reasonable’ ... depends largely upon the social necessity that prompts the search.” Id. at 681-82, 109 S.Ct. at 1399, 103 L.Ed.2d at 712-13 (Scalia, J., dissenting). However, it did not find sufficient social necessity to require drug testing of Customs Service employees handling classified material without evidence of a real drug use problem among them. Id.
The analysis the Court used in Vernonia School District 47J v. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), to examine drug testing of students is very useful. First, the Court considered the nature of the privacy interest intruded upon by the search and the legitimacy of the privacy expectation. Id. at 654, 115 S.Ct. at 2391, 132 L.Ed.2d at 575. The second factor considered was the complained-of character of the intrusion. Id. at 658, 115 S.Ct. at 2393, 132 L.Ed.2d at 577 (recognizing urinalysis intrudes on a traditionally shielded private function). Finally, the court analyzed “the nature and immediacy of the governmental concern at issue here, and the efficacy of this means for meeting it.” Id. at 660, 115 S.Ct. at 2394, 132 L.Ed.2d at 579. Rather than a minimum level of interest, the Court found the governmental interest needed to be important enough to outweigh the privacy interest and the extent of the intrusion. Id. at 661, 115 S.Ct. at 2394-95, 132 L.Ed.2d at 579. The Court found the drug problem among students in the community was severe enough to permit random war-rantless, suspicionless urinalysis of students who participated in sports. Id. at 664-65, 115 S.Ct. at 2396, 132 L.Ed.2d at 582. Justice O’Connor dissented, suggesting that suspicion-based searches were not impracticable in the particular context, rendering the blanket suspicionless search unreasonable. Id. at 671, 679-81, 115 S.Ct. at 2399, 2403-04, 132 L.Ed.2d at 586, 591-92 (O’Connor, J., dissenting) (“Protection of privacy, not evenhandedness, was *115 then and is now the touchstone of the Fourth Amendment.”).
In Chandler v. Miller, 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997), the Supreme Court placed boundaries on the special-needs exception as to warrantless, suspicionless searches. The State of Georgia wanted to mandate drug testing for political candidates similar to the requirements for railroad employees in Skinner and border patrol agents in Von Raab. Chandler, 520 U.S. at 308-09, 117 S.Ct. at 1298, 137 L.Ed.2d at 519-20. However, the Court found “[o]ur precedents establish that the proffered special need ... must be substantial — important enough to override the individual’s acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment’s normal requirement of individualized suspicion.” Id. at 318, 117 S.Ct. at 1303, 137 L.Ed.2d at 526. In order to find a special need, there must be an indication of concrete dangers, not merely hypothetical ones, that justify departing from the basic prescriptions of the Fourth Amendment. Id. at 318-19, 117 S.Ct. at 1303, 137 L.Ed.2d at 526. “[Wjhere the risk to public safety is substantial and real, ... searches calibrated to the risk may rank as ‘reasonable.’ ” Id. at 323, 117 S.Ct. at 1305, 137 L.Ed.2d at 529.
Overall, the most pertinent federal precedent in the special-needs area for the present case is Griffin,[5] The Griffin Court held the special-needs exception applied to a search of a probationer’s home by a probation officer, even when conducting the search for law enforcement purposes rather than probationary purposes. 483 U.S. at 874-75, 107 S.Ct. at 3169, 97 L.Ed.2d at 717-18 (majority opinion). The other special-needs cases shape and modify how special-needs exceptions are evaluated and applied. While several of the opinions permit suspicionless searches, those are limited by the findings of minimal privacy rights that are invaded, Skinner, 489 U.S. at 624, 109 S.Ct. at 1417, 103 L.Ed.2d at 664, and the requirement that the governmental need has to be important enough to override the privacy rights of the individual, Chandler, 520 U.S. at 318, 117 S.Ct. at 1303, 137 L.Ed.2d at 526. Moreover, the only concerns that have made it through the Court’s important-concern test are drugs in schools or relate to the safety of the public and individuals. Acton, 515 U.S. at 664-65, 115 S.Ct. at 2396, 132 L.Ed.2d at 582 (majority opinion); Von Raab, 489 U.S. at 668, 109 S.Ct. at 1392, 103 L.Ed.2d at 704 (majority opinion); Skinner, 489 U.S. at 620-21, 109 S.Ct. at 1415, 103 L.Ed.2d at 662; see also Mich. Dep’t of State Police v. Sitz, 496 U.S. 444, 454-55, 110 S.Ct. 2481, 2487-88, 110 L.Ed.2d 412, 423 (1990) (upholding a warrantless, suspicionless sobriety checkpoint using empirical data to support its need and efficacy).
In 2003, we applied the special-needs doctrine in a case involving the search of a school locker by school officials. State v. *116 Jones, 666 N.W.2d 142-43 (Iowa 2003). In doing so, we borrowed from the federal jurisprudence and adopted the three-factor test to determine if the doctrine would support the warrantless search of the lockers. Id. at 146. Under the analysis, we considered (1) the nature of the privacy interest at stake, (2) the character of the intrusion, and (3) the nature and immediacy of the government concern at stake and the ability of the search to meet the concern. Id. We applied these factors to uphold a warrantless random search of school lockers. Id. at 150.
We have not applied the special-needs doctrine beyond the search of school lockers. We have evaluated the doctrine, however, in the context of the search of the home of a parolee by police officers who suspected the parolee had drugs inside the house. See generally Kern, 831 N.W.2d at 165-72. Yet, we did not assess the doctrine beyond the specific circumstances of the case. See id. at 170-72. These circumstances revealed police officers conducted the search for the primary purpose of gathering and using evidence for a criminal prosecution. Id. at 171. Thus, evaluating the case through the lens of our search and seizure clause, we did not see the doctrine as a means to enable law enforcement officers to carry out their duties in gathering evidence of criminal activity. Id. at 170. Moreover, the circumstances of the case did not demonstrate any reason that the warrant requirement of the right against unreasonable search and seizure would have frustrated the purpose of the search. Id. at 172. Accordingly, we did not view the doctrine as a means to excuse requiring law enforcement officers to obtain a search warrant under the Iowa Constitution. Id.
Thirty-three years earlier, we addressed some of the underpinnings of the special-needs doctrine in the context of the search of an apartment of a parolee initiated by his parole officer, without making any specific reference to the doctrine. State v. Cullison, 173 N.W.2d 533 (Iowa 1970). In that case, we rejected the theories used to minimize the constitutional protections of parolees and held that parolees maintain the same safeguards afforded all people against warrantless searches involving evidence of new crimes. Id. at 538. The search conducted in Cullison began as a parole-related visit by a parole officer to determine the reason the parolee failed to show up for work. Id. at 534. After leaving and then returning to the apartment, the parole officer asked to search a locked room of the apartment to investigate for any other parole violations. Id. at 535. The parole officer “became suspicious” after the parolee objected to his request to have the locked door opened and after the parolee told him there was something in the room that he did not want him to see. Id. The parole officer knew at the time that there had been recent burglaries in the area, and he sought the assistance of a police officer to assist in entering and searching the room. Id. We held the search violated the Federal Search and Seizure Clause because it was not based on probable cause. Id. at 539-40. The special-needs doctrine was not fully developed at the time, and the facts of the case blurred any line between a search by a parole officer to carry out the parole mission and a search by law enforcement personnel for evidence of criminal activity. See id. Nevertheless, we expressed no constitutional criticism of the search of the apartment by the parole officer until the officer became suspicious of the contents of the locked room and obtained the assistance of a police officer to pursue that suspicion. Id. at 538 (protecting the parolee’s constitutional safe *117 guards only “as to a new and separate crime”).
In State v. Ochoa, 792 N.W.2d 260 (Iowa 2010), we held that a search by police of a motel room occupied by a parolee was unreasonable under the search and seizure clause of the Iowa Constitution when based solely on the parolee’s status. Ochoa, 792 N.W.2d at 289-91. Notwithstanding, we acknowledged “[a] properly limited, nonarbitrary warrantless search of the home by a parole officer might conceivably be supported under the ‘special needs’ doctrine.” Id. at 288.
In State v. Short, 851 N.W.2d 474 (Iowa 2014), we were confronted with “an investigatory search by law enforcement related to new crimes” at the home of a probationer. Short, 851 N.W.2d at 477. We held “the warrant requirement has full applicability to home searches of both probationers and parolees by law enforcement.” Id. at 506. We declared a search by law enforcement without an adequate warrant violated the search and seizure clause of the Iowa Constitution, but acknowledged the search involved “was not a probationary search.” Id. at 477, 505. We again reserved the question whether searches by probation or parole officers as a part of their ordinary duties would be permissible. Id. at 505. At the same time, we emphasized that the warrant requirement cannot be overcome by notions of reasonableness detached from the protections sought. Id. at 502.
B. Application. The facts at issue in this case bring us directly to that point in time when we now fully confront whether the special-needs doctrine of governmental concerns that justify a warrantless search includes the search of the home of a parolee by a parole officer for the purpose of carrying out the mission of parole. We do this, not to overturn or alter our prior opinions concerning searches and seizures as related to parolees, but rather, to answer the question expressly left open by those decisions. See id. at 505 (reserving the question of a search by a parole officer as part of ordinary duties for another day); Kern, 831 N.W.2d at 170-71 (explaining any special-needs doctrine “would require that the search by a parole officer be designed to fit the special needs of parole” before concluding such a situation did not exist in that case); State v. Baldon, 829 N.W.2d 785, 789 (Iowa 2013) (noting no evidence was introduced about a need for the parole officer to search consistent with the general mission of parole); Ochoa, 792 N.W.2d at 288 (noting that “[a] properly limited, nonarbitrary warrantless search of the home by a parole officer might conceivably be supported under the ‘special needs’ doctrine”); Gullison, 173 N.W.2d at 544 (Stuart, J., dissenting) (arguing the majority did not answer the question of whether a parole-officer search as part of ordinary duties fits within a warrantless-search exception). We analyze the parole search issue by considering the three factors identified in Jones.
1. Nature of the privacy interest. The first factor considers the nature of the privacy intruded upon' by the search. Jones, 666 N.W.2d at 146. In considering this factor, we start with the principle that parolees have the same expectation of privacy in their homes as persons not convicted of crimes and not on probation or parole. Cullison, 173 N.W.2d at 537-38 (majority opinion); see also Ochoa, 792 N.W.2d at 290-91. Yet, that equal footing recognized under our Iowa Constitution predominantly exists in the context of the search and seizure by law enforcement officers for evidence of crimes. See Kern, 831 N.W.2d at 164-65, 170-71. Unlike people not on parole from a sentence of incarceration resulting from a prior criminal conviction, parolees are under the su *118 pervision of the government pursuant to a written parole agreement. See Iowa Code § 906.1 (2013); Iowa Admin. Code r. 201 — 45.1(2). These agreements require the parolee to submit to searches and other governmental intrusions not permitted against people not on parole. Iowa Admin. Code r. 201 — 45.2 (describing standard conditions of parole and permitting additional special conditions to be imposed in the agreement). See generally Baldon, 829 N.W.2d at 789-802 (tracing the use and effect of consent-to-search clauses). If a term of the agreement is not followed, the parole can be revoked and the parolee returned to confinement to serve out the remainder of the sentence. Iowa Admin. Code r. 201- — 45.4. Thus, the expectation of privacy in a home enjoyed by parolees can come at an expense not faced by people not on parole. In other words, parolees can share the full expectation of privacy afforded nonparolees only if the parolee chooses to violate the parole agreement by refusing to permit a reasonable search and risk paying the possible price of revocation of parole.
In Cullison, the parole agreement did not require the parolee to permit the parole officer to search the apartment, nor did it give the parolee notice that such a search might occur. 173 N.W.2d at 534 (“Teeters executed an instrument by which he agreed to conduct himself honestly, obey the law, keep reasonable hours, refrain from excessive use of intoxicants, and remain at all times in Montgomery County.”). Thus, the parolee maintained the same expectation of privacy enjoyed by people not out on parole and required the state to justify the warrantless search on other grounds permitted under the constitution, not simply his status as a parolee. See id. at 537-38. Because no such grounds existed and no other grounds supported the search, a warrant was necessary for the search to be constitutional. Id. at 540.
In this case, King did not choose to maintain his privacy interest by refusing access to his residence or the bedroom of his residence. Instead, he complied with the terms of parole by allowing the parole officers into his apartment and showing them to his bedroom to conduct the search. Of course, these acts of compliance did not establish an independent ground to search based on a waiver of his constitutional rights. See Baldon, 829 N.W.2d at 802-03. No such independent grounds existed. However, the acts of compliance did place the government and King on different footing than the government and the parolee in Cullison, in which the search was refused. See 173 N.W.2d at 535. The parole officers conducted, and King did not refuse, the search pursuant to the terms of the parole agreement. Further, unlike Cullison, the parole agreement served to diminish the expectation of privacy of the parolee in relation to his parole officer by placing him on notice that such a search might occur. Thus, we must decide if the interests of the government under these circumstances are strong enough to prevail over the legitimate privacy interests of a parolee who has failed to refuse or in any way signal a lack of consent to a search the parolee had notice could occur. This approach continues to protect the longstanding and historical protections tied to a home under article I, section 8 of the Iowa Constitution, but recognizes these protections can at times be altered by the provisions parolees must comply with under parole agreements to maintain their conditional freedom. Thus, a legitimate expectation of privacy exists, even if altered by the parole agreement as it relates to the parole officer, and our task is to determine whether the right has been violated by considering the competing interests at stake. See State v. Lowe, 812 N.W.2d 554, 567-68 (Iowa 2012) (evaluat *119 ing whether a legitimate expectation of privacy existed before addressing if there had been an unreasonable intrusion upon it). We therefore proceed to the second factor to consider the character of the intrusion posed by the policy behind the search. Jones, 666 N.W.2d at 148.
2. Character of the intrusion. The policy of a parolee search is embedded in the supervisory relationship between the parole officer and the parolee, as well as the historical purpose and goal of our system of parole. See generally Morrissey v. Brewer, 408 U.S. 471, 478-79, 92 S.Ct. 2593, 2598-99, 33 L.Ed.2d 484, 492-93 (1972). A review of this history helps reveal the character of the intrusion in this case.
The theory of parole originated in Alexander Maconochie’s system of supervising the British penal colony in Australia in the 1840s, where prisoners earned marks and progressed through gradations of servitude to earn their ticket-of-leave. 1 Neil P. Cohen, The Law of Probation and Parole § 1:11, at 1-17 to -18 (2d ed.1999) [hereinafter Cohen]. In the 1850s, Ireland adapted the idea into their penal system under the leadership of Walter Crofton, who introduced the element of postrelease supervision. Id. § 1:11, at 1-18; Joan Petersilia, Parole and Prisoner Reentry in the United States, 26 Crime & Just. 479, 488 (1999) [hereinafter Petersilia]. The parole system made it to America in 1876 when adopted for the juvenile reformatory system in New York, with the addition of indeterminate sentencing.[6] 1 Cohen § 1:12, at 1-19; Petersilia, 26 Crime & Just, at 488. It spread quickly to other states, no longer restricted to juveniles. 1 Cohen § 1:12, at 1-19. Today, most states and the federal government have statutes and regulations providing for parole and methods of supervision and enforcement that vary widely, making comparisons among and between jurisdictions of limited utility.[7] See id. § 1:21, at 1-30; Petersilia, 26 Crime & Just, at 494-96.
Iowa first provided “for a system of reform and parole” in 1907 with an act pertaining to “Indeterminate sentences and reformatory.” 1907 Iowa Acts ch. 192 (codified at Iowa Code §§ 5718-a4 to -a26 (1907 Supp.)). The Act converted one of the state penitentiaries into a reformatory. Iowa Code § 5718-a4. The reformatory was available for all female convicts and first-time male convicts between ages sixteen and thirty who were not convicted of specified heinous crimes. Id. §§ 5718-a5, -a27. The Act also established indeterminate sentences for the first time for all crimes except murder and treason. Id. § 5718-al3. The board of parole was also established and delegated the “power to establish rules and regulations” for releasing persons to parole. Id. §§ 5718-a14, - a18. It allowed
*120 prisoners ... to go upon parole outside of the penitentiary buildings, ... but to remain while on parole in the legal custody of the wardens ... and under the control of the said board of parole and subject, at any time, to be taken back and confined within the penitentiary.
Id. § 5718-al8. The board was further empowered to determine when the parolee had sufficiently become a law-abiding citizen and when he or she could be released from parole. Id. § 5718-a20.
Early on, Iowa courts treated parole as “a conditional pardon.” Kirkpatrick v. Hollowell, 197 Iowa 927, 931, 196 N.W. 91, 92 (1923). Parole was considered “a conditional and experimental release before expiration of sentence.” Addis v. Applegate, 171 Iowa 150, 173, 154 N.W. 168, 176 (1915) (Salinger, J., concurring). In 1923, the extraordinary session of the Iowa legislature amended the Code sections on charitable, correctional, and penal institutions. 1923 Iowa Acts Extraordinary Sess. (unpublished) ch. 55, §§ 481 to 506-a1 (1924) (codified at Iowa Code §§ 3782-3811 (1924)). Among other provisions, probation as we now know it was created, but under the name “court parole” (as opposed to the “board parole” dealing with the release of those already in prison). See Iowa Code §§ 3786, 3788, 3800 (providing for “parole before commitment” by the board of those not previously convicted of a felony and for the court to suspend sentence and parole). It is this probation or court parole — also called “bench parole” — that the Iowa courts referred to as “a matter of grace, favor, and forgiveness.” Pagano v. Bechly, 211 Iowa 1294,1298, 232 N.W. 798, 799-800 (1930) (comparing suspended sentence and parole to a pardon, within the conditions and limitations provided by statute); see also Cole v. Holli-day, 171 N.W.2d 603, 605 (Iowa 1969); State v. Boston, 234 Iowa 1047, 1051, 14 N.W.2d 676, 679 (1944).
In 1972, the United States Supreme Court had occasion to examine the Iowa system of parole in Morrissey, in a challenge to Iowa’s method of parole revocation. Part of the examination included a description of parole officers and their role:
The parole officers are part of the administrative system designed to assist parolees and to offer them guidance. The conditions of parole serve a dual purpose; they prohibit, either absolutely or conditionally, behavior that is deemed dangerous to the restoration of the individual into normal society. And through the requirement of reporting to the parole officer and seeking guidance and permission before doing many things, the officer is provided with information about the parole and an opportunity to advise him. The combination puts the parole officer into the position in which he can try to guide the parolee into constructive development.
Morrissey, 408 U.S. at 478, 92 S.Ct. at 2599, 33 L.Ed.2d at 492-93. Just a few months later, we observed the similarities between probation and parole — that although probation and parole take place at opposite ends of a prison sentence, with probation resulting from judicial action before prison and parole resulting from administrative action following prison, “both follow conviction and imposition of sentence.” State v. Wright, 202 N.W.2d 72, 76 (Iowa 1972).
The Iowa legislature revised the criminal code in 1976, effective January 1, 1978. 1976 Iowa Acts ch. 1245 (codified in scattered sections of Iowa Code (1979)); id. ch. 1245, ch. 4, § 529. One provision replaced the legal custody of parolees with departmental supervision of parolees. Prior to the revision, Iowa Code section 247.9 provided that “[a]ll paroled prisoners shall *121 remain, while on parole, in the legal custody of the warden or superintendent and under the control of the chief parole officer.” Iowa Code § 247.9 (1977). The new statute provided that “[e]very person while on parole shall be under the supervision of the department of social services, which shall prescribe regulations for governing persons on parole.” Iowa Code § 906.5 (1979).
In 1983, the Iowa Department of Social Services was reorganized, establishing the Iowa Department of Corrections. Iowa Code ch. 217A (1985). At that time, the parole functions were transferred to the newly created department of corrections. Id. § 906.1. Today, parole officers are still part of the department of corrections, working out of the local judicial district department of correctional services. Iowa Code § 906.2 (2013).[8]
 When granting parole, the board of parole does not grant an inmate “the absolute liberty to which every citizen is entitled, but only ... the conditional liberty properly dependent on observance of special parole restrictions.” Morrissey, 408 U.S. at 480, 92 S.Ct. at 2600, 33 L.Ed.2d at 494. “Conditional” liberty means that in order to remain in the community instead of being re-incarcerated, the parolee must comply with both standard conditions of parole required of all parolees, and special conditions imposed depending on the needs of that particular case. Iowa Admin. Code r. 201 — 45.2(1) (listing standard conditions); id. r. 201— 45.2(2) (providing for the imposition of parolee-specific special conditions). A parole officer has the obligation to monitor the compliance with those conditions of each of the persons under supervision. See id. r. 201 — 45.4, .6 (requiring parole officer recommend when to revoke, continue, or discharge parole). Today, our legislature has statutorily defined parole as
the release of a person who has been committed to the custody of the director of the Iowa department of corrections by reason of the person’s commission of a public offense, which release occurs prior to the expiration of the person’s term, is subject to supervision by the district department of correctional services, and is on conditions imposed by the district department.
Iowa Code § 906.1.
The supervision component of parole necessarily involves intrusion by government into the lives of parolees as they assimilate back into society. See Griffin, 483 U.S. at 874-75, 107 S.Ct. at 3169, 97 L.Ed.2d at 718. But, the intrusions based on the policy of the purpose of parole, rehabilitation of the parolees and maintaining public safety, are unrelated to the purpose of gathering evidence of criminal behavior that has already occurred for the purpose of enforcing laws through a criminal prosecution. See Kern, 831 N.W.2d at 170-72; Ochoa, 792 N.W.2d at 286. The parole officer needs to be able to evaluate the parolee’s compliance with all the conditions of the parole agreement to determine if any assistance is needed, to evaluate if the parolee is ready for discharge, or to revoke parole if necessary. Iowa Code §§ 906.2, .15; Iowa Admin. Code r. 201— 45.4. While criminal prosecutions can re- *122 suit from parolee conduct subject to conditions of parole that is also criminal conduct, the intrusions are often considered a necessary part of the supervision and an essential ingredient to the success of parole. 1 Cohen, § 17:7, at 17-11 to -12. Without reasonable intrusions, the goal and purpose of parole would be difficult, if not impossible, to accomplish. See id. §§ 17:16-:17, at 17-27 to -29 (discussing the exclusionary rule and the necessity of searches in relation to parole revocation).
The character of the particular intrusion at issue in this case, of course, is the search of the residence of a parolee by a parole officer. Yet, the intrusion in this case was much different than we confronted in Cullison. See 173 N.W.2d at 534-35. In Cullison, the parolee not only refused to permit his parole officer to search the locked room, but the warrantless search that followed was conducted with the aid of a law enforcement officer and pursued with a suspicion that the room might contain evidence of a new and independent crime. Id. at 535. The initial intrusion by the parole officer in the apartment, however, was consistent with the mission of parole and was not part of the analysis that found the search of the home to be unconstitutional. See id. at 538. Instead, the intrusion only ran afoul of the Iowa Constitution when the search became intertwined with the state’s interest in law enforcement after the parolee placed limits on the search area. See id. at 539-40. Thus, Cullison did not address the constitutionality of all parole searches, and its holding does not preclude all parole searches. See id. at 544 (Stuart, J., dissenting). Rather, we confined our analysis in Cullison to nonconsensual warrantless parole searches of “the parolee’s living quarters in connection with the prosecution of a new and independent criminal action.” Id. at 535 (majority opinion). The question we answered was “what constitutional rights, if any, an individual surrenders upon conditional release from one of our state penal institutions.” Id. We did not address how the answer to that question would affect a parole search, pursuant to a parole agreement, that was divorced from the objectives of law enforcement and confined to the special needs of parole officers in supervising parolees. See id. at 537-38.
A distinction exists between searches to pursue the purposes of law enforcement and those to pursue the purposes of carrying out the mission of parole. See Kern, 831 N.W.2d at 170. The special needs of parole are divorced from the general interests of the state in law enforcement. See Ferguson v. City of Charleston, 532 U.S. 67, 79-80, 121 S.Ct. 1281, 1289-90, 149 L.Ed.2d 205, 217 (2001) (requiring the nature of the special need be “divorced from the State’s general interest in law enforcement”). Thus, the special role of parole officers in carrying out the objectives and policy of parole becomes critical to the analysis. See Samson v. California, 547 U.S. 843, 858-59, 126 S.Ct. 2193, 2203, 165 L.Ed.2d 250, 263-64 (2006) (Stevens, J., dissenting). As identified in Griffin, the special role of parole and probation is derived from the “ongoing supervisory relationship — and one that, is not, or at least not entirely, adversarial — between the object of the search and the decisionmaker” not present in other searches. 483 U.S. at 879, 107 S.Ct. at 3171, 97 L.Ed.2d at 721. Indeed, not all objects of a parole search are subject to criminal investigation outside of parole, including conditions limiting alcohol consumption and persons with whom the parolee may associate. Yet, for the special-needs analysis to apply, the reasons for the search must be the interest in supervising the reintegration of parolees into society, “not, or at least not principally, the general law enforcement goal of *123 detecting crime.” Samson, 547 U.S. at 859, 126 S.Ct. at 2203, 165 L.Ed.2d at 264.
At the same time, an intrusion permissible under article I, section 8 must be narrowly defined. The purpose of search and seizure clauses “is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials,” Camara, 387 U.S. at 528, 87 S.Ct. at 1730, 18 L.Ed.2d at 935, and the traditional exceptions to the warrant requirement are “specifically established and well-delineated,” Katz, 389 U.S. at 357, 88 S.Ct. at 514, 19 L.Ed.2d at 585, to maintain safeguards when a warrant is impractical. See Ochoa, 792 N.W.2d at 278-79. Thus, an exception permitting special-needs parole searches must contain measures to protect against unfettered discretion by the state. Samson, 547 U.S. at 860, 126 S.Ct. at 2204, 165 L.Ed.2d at 264. For parole searches to meet this requirement, the intrusion must serve at every point the mission and policy of parole as it applies to that particular parolee, not general law enforcement.
The character of the intrusion is also shaped by the scope of the search. The scope is limited to only those actions reasonable to ensure the parolee’s compliance with the parole conditions with the goal of rehabilitation. If the scope of the parole search becomes too broad, it can take on the form of a search that serves the goals beyond the mission of parole. See Kern, 831 N.W.2d at 170 (describing when police presence shifts the purpose of the search beyond parole goals). Additionally, intrusions into certain areas within the house or containers within the home can heighten the privacy interest at stake. See United States v. Ross, 456 U.S. 798, 822-23, 102 S.Ct. 2157, 2172, 72 L.Ed.2d 572, 592 (1982) (“[T]he Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view. But the protection afforded by the Amendment varies in different settings.” (Citation omitted.)). Therefore, the parole officer must limit the scope of the search to only those areas necessary to ensure compliance with the specific parole conditions the parole officer has a reasonable suspicion have been violated and only to the extent a reasonable person would find appropriate under the facts supporting that suspicion.
“[Reasonable suspicion is based on an objective standard: whether the facts available to the officer at the time of the stop would lead a reasonable person to believe that the action taken by the officer was appropriate.” State v. Kinkead, 570 N.W.2d 97, 100 (Iowa 1997). This determination is made “in light of the totality of the circumstances confronting the officer,” including specific, articulable facts and the rational inferences drawn from them. State v. Tague, 676 N.W.2d 197, 204 (Iowa 2004). The standard is more than a hunch or unparticularized suspicion, but less demanding than showing probable cause: State v. Walshire, 634 N.W.2d 625, 626 (Iowa 2001); Kinkead, 570 N.W.2d at 100. We have upheld the reasonable-suspicion standard in vehicular stop contexts for investigatory purposes, while requiring probable cause to effect a seizure. State v. Tyler, 830 N.W.2d 288, 293, 298 (Iowa 2013). “[Reasonable cause may exist to investigate conduct which is subject to a legitimate explanation and turns out to be wholly lawful.” State v. Richardson, 501 N.W.2d 495, 497 (Iowa 1993).
In this case, the search extended into the bedroom of the parolee and included the search of a sunglasses case located on the headboard of the bed. Thus, the search extended beyond a visual inspection for drugs in plain view and into a more personal space of the parolee beyond the *124 area of the initial encounter. See generally State v. Oliver, 341 N.W.2d 744, 745—47 (Iowa 1983) (explaining the requirements to establish a plain view exception to search and seizure law). This intrusion made the search more invasive, but not necessarily detached from the policy behind the search. The concerns that prompt the parole search in general need to be broad enough to achieve the purpose of parole, but narrow enough that the search not be arbitrary or depart from the parole mission. A parolee knows his home is subject to search under the parole agreement, and the policy prompting the need to search could be jeopardized if the search area is too constrained. Furthermore, King lived alone. The search did not intrude upon the privacy interests of other persons.
As to the search of the sunglasses case, it is commonly documented and understood that drugs and their paraphernalia are often hidden in small, everyday containers. See State v. Finch, No. 02-1148, 2003 WL 22828750, at *2 (Iowa Ct.App. Nov. 26, 2003) (Altoid tin); see also Lowe, 812 N.W.2d at 564 (fruit can); State v. Maxwell, 743 N.W.2d 185, 189 (Iowa 2008) (cigarette pack); State v. Eubanks, 355 N.W.2d 57, 58 (Iowa 1984) (makeup case); State v. Meksavanh, No. 12-1878, 2014 WL 3749356, at *2 (Iowa Ct.App. July 30, 2014) (lamp shade, dresser drawer, purse, floor of backseat of car); State v. Simmons, No. 12-0567, 2013 WL 1750986, at *1 (Iowa Ct.App. Apr. 24, 2013) (cover of a speaker); State v. Hoosman, No. 09-0067, 2010 WL 1579428, at *2 (Iowa Ct.App. Apr. 21, 2010) (fake can of soda, CD case, ball of lint in laundry room); State v. Palmer, No. 03-1824, 2006 WL 126439, at *1 (Iowa Ct.App. Jan. 19, 2006) (flashlight). We have established a principle that there must be a nexus between the place searched and the object of the search. State v. Hoskins, 711 N.W.2d 720, 728 (Iowa 2006). This nexus includes “the nature of the items involved, the extent of the defendant’s opportunity for concealment, and the normal inferences as to where the defendant would be likely to conceal the items.” State v. Groff, 323 N.W.2d 204, 212 (Iowa 1982). Thus, Scar-mon’s search for evidence of drug-addiction relapse needed to be limited to those containers and areas that normal inferences, based on his past experience and knowledge of King, would lead him to believe King would conceal drugs or paraphernalia. A sunglasses case fits within the parameters to conceal methamphetamine and its paraphernalia, the suspected relapse drug. Additionally, the container was in plain view within the bedroom. More private areas within the bedroom were not entered.
The policy behind parole searches cannot be achieved if the search is so constrained that it would exclude the ability to search those common areas where the object of the search would be most commonly found. This approach is consistent with the nexus requirement applicable to all searches and serves to both constrain the scope of the search and make the search broad enough to serve its goal. See Hoskins, 711 N.W.2d at 728 (permitting logical inferences in nexus consideration).
Overall, the character of the intrusion is modified when the parolee does not refuse the search.[9] It is also modified when the discretion to search is narrowed by the mission of parole and divorced from the general law enforcement objectives. The search also takes on a less intrusive char *125 acter when it is confined to areas directly related to the concern that supported the decision to search. The policy of a parole search is separate from policies that promote the discovery of evidence to use in a new and independent prosecution. Accordingly, we proceed to consider the nature and immediacy of the concerns of the parole officer that led to the search of King’s apartment.
3. Nature of governmental concerns and efficacy of search policy. The general governmental concern at stake in this case involves compliance by parolees with the conditions of their parole to prevent recidivism. The policies of rehabilitating parolees and maintaining public safety are both enforced through the mechanism of the supervision of the parolee and the conditions imposed for the duration of parole. The board of parole is instructed to release those persons who can be released “without detriment to the community or to the person.” Iowa Code § 906.4(1). The parole officer is then tasked with the responsibility to “keep informed of each person’s conduct and condition” to encourage rehabilitation and ensure public safety. Id. § 906.2; see also 1 Cohen § 17:7, at 17-10 to -11 (“The ... parole officer has the primary responsibility for supervision of a parolee’s ... rehabilitative progress. This caseworker ... owes a responsibility to the public to ensure that [those] who pose a threat to public safety are not permitted to remain free.... ”). Ultimately, the parole officer’s concern is the prevention of future crime through rehabilitation and close supervision until that rehabilitation is achieved. See 1 Cohen § 1:20, at 1-29, § 17:1, at 17-2. The legislature expressly directed parole officers to “use all suitable methods to aid and encourage the person to bring about improvement in the person’s conduct or condition.” Iowa Code § 906.2.
The specific nature of the concerns of government that gave rise to the search in this case related to a reasonable suspicion of drug use and loss of interest in completing parole by the parolee. These concerns surfaced from information obtained by the parole officer in his supervisory role. No law enforcement officers or law enforcement information was involved. The concerns related to the purposes and objectives of King’s parole, not the enforcement of criminal laws. Even though the parole officer suspected parole violations that included unlawful activity, the concern that motivated the search was not formulated or acted upon by the parole officer for the primary purpose of enforcing the law.
The absence of an adversarial relationship between the parolee and the parole officer in this case is important in identifying the concerns of government. Only the parole officer, through the ongoing relationship with the parolee, possesses the knowledge of both the conditions imposed on a particular parolee and the conduct signaling a violation that rises to the level of a reasonable suspicion of parole violation that needs to be pursued by the parole officer. If such conduct has risen to a level that involves law enforcement officials who approach the parole officer with suspicions of new criminal wrongdoing they want to pursue, the matter has moved beyond the scope of the government’s concern of parole compliance and into the realm of law enforcement. This factor distinguishes this case from our prior parolee search cases that involved, in varying degrees, law enforcement officers and law enforcement purposes. See Kern, 831 N.W.2d at 157 (involving law enforcement officers searching with suspicion but no warrant with the approval of a parole officer who arrived part way through the search); Ochoa, 792 N.W.2d at 262-63 (involving police officer conducting a suspi-cionless, warrantless search); Cullison, *126 173 N.W.2d at 535 (involving parole and police officer searching with suspicion of a specific new criminal activity). This factor does not transform the case into those involving a detached magistrate, but it helps reduce the evil sought to be eliminated by the search and seizure clause when the decision to search is made by a law enforcement officer. See Griffin, 483 U.S. at 876, 107 S.Ct. at 3170, 97 L.Ed.2d at 719 (“Although a probation officer is not an impartial magistrate, neither is he the police officer....”). There was no evidence that the parole officer in this case was motivated by the goals and purposes of law enforcement.
The specific, articulable concerns of the parole officer giving rise to a reasonable suspicion to support a search derived from information associated with the supervision of parolees. The concerns involved specific behaviors and comments of the parolee, an evaluation of the likelihood of violations of particular parole agreement conditions, and a triggering event in the form of the monitoring bracelet alert. This factor, requiring a particularized concern with specific articulable facts and reasonable suspicion to support the search, helps prevent arbitrary discretionary searches under the search and seizure clause.
The immediacy of the government concerns were derived from the general mission of parole supervision. The supervision of parolees requires intervention “at the first sign of trouble” and “at an earlier stage of suspicion.” Id. at 883, 107 S.Ct. at 3173, 97 L.Ed.2d at 723 (Blackmun, J., dissenting). “[RJesearch suggests that more intensive supervision can reduce recidivism.” Id. at 875, 107 S.Ct. at 3169, 97 L.Ed.2d at 718 (majority opinion). Moreover, delays in searching can reduce the deterrent effect provided by prompt searches. Id. at 876, 107 S.Ct. at 3170, 97 L.Ed.2d at 719.
We recognize there are other less intrusive means for probation officers to discover whether or not a parolee is violating a provision in the parole agreement prohibiting drug use. The collection of a substance from the body for drug testing is one such means, as the facts of this case disclose. However, the supervision of a parolee requires latitude and real-time responses. A response geared to the discovery of drugs in a house can present a more comprehensive view of the problems that need to be addressed by a parolee for the parole officer. A different picture is presented for the parole officer by the discovery of drugs in the home of a parolee than from the detection of drugs in the blood or urine of a parolee, including a means to gauge the severity of the relapse. Thus, a search can provide a better vehicle than drug testing to meet the legitimate concerns of government.
The balance of the three factors from Jones is critical to our finding a special need to allow narrowly tailored parolee searches. See 666 N.W.2d at 145-46. Overall,
the question in every case must be whether the balance of legitimate expectations of privacy, on the one hand, and the State’s interests in conducting the relevant search, on the other, justifies dispensing with the warrant and probable-cause requirements that are otherwise dictated by the [Search and Seizure Clause].
Samson, 547 U.S. at 864, 126 S.Ct. at 2206-07, 165 L.Ed.2d at 267. On balance, we conclude parole officers have a special need to search the home of parolees as authorized by a parole agreement and not refused by the parolee when done to promote the goals of parole, divorced from the goals of law enforcement, supported by reasonable suspicion based on knowledge arising out of the supervision of parole, *127 and limited to only those areas necessary for the parole officer to address the specific conditions of parole reasonably suspected to have been violated. The facts of this case satisfy this narrowly tailored standard. We do not address the application of this standard to probationers or how the scope of the search might be affected by the expectations of privacy held by others living in the same home. Accordingly, we affirm the judgment of the district court.
IV. Conclusion.
We adopt a special-needs exception that authorizes parole officers to search the home of a parolee without a warrant for purposes of parole supervision. We affirm the judgment and sentence of the district court.
AFFIRMED.
WATERMAN, MANSFIELD, and ZAGER, JJ., join this opinion. MANSFIELD, J., files a separate concurring opinion in which WATERMAN, J., joins. APPEL, J., files a dissenting opinion in which WIGGINS and HECHT, JJ., join.

. The assertion of and claims regarding the right primarily arise in the criminal context due to the sole means of remedy: the suppression of evidence in a prosecution against an accused that was obtained in or because of an unconstitutional search or seizure of the accused, their home, or things. Linkletter v. Walker, 381 U.S. 618, 634, 85 S.Ct. 1731, 1740, 14 L.Ed.2d 601, 611 (1965) (“We also affirmatively found that the exclusionary rule was ... the only effective remedy for the protection of rights under the Fourth Amendment....''), abrogated on other grounds by Griffith v. Kentucky, 479 U.S. 314, 320-22, 107 S.Ct. 708, 712-13, 93 L.Ed.2d 649, 656-57 (1987); Wong Sun v. United States, 371 U.S. 471, 487-88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455 (1963) (holding evidence obtained at the exploitation of an illegal search and seizure cannot be used against the person searched); see also State v. Cline, 617 N.W.2d 277, 291 (Iowa 2000) (“There is simply no meaningful remedy available to one who has suffered an illegal search other than prohibiting the State from benefiting from its constitutional violation.”), overruled on other grounds by State v. Turner, 630 N.W.2d 601, 606 n. 2 (Iowa 2001).

. Though performed by the railroad companies, there were sufficient "indices of the Government’s encouragement, endorsement, and participation” to implicate the Fourth Amendment. Skinner, 489 U.S. at 615-16, 109 S.Ct. at 1412, 103 L.Ed.2d at 658-59.

. The railroad industry’s experience ... persuasively shows, and common sense confirms, that the customary dismissal sanction that threatens employees who use drugs or alcohol while on duty cannot serve as an effective deterrent unless violators know that they are likely to be discovered. By ensuring that employees ... know they will be tested upon the occurrence of a triggering event, the timing of which no employee can predict with certainty, the regulations significantly increase the deterrent effect of the administrative penalties associated with the prohibited conduct.
Skinner, 489 U.S. at 629-30, 109 S.Ct. at 1420, 103 L.Ed.2d at 668.

. A warrant serves primarily to advise the citizen that an intrusion is authorized by law and limited in its permissible scope and to interpose a neutral magistrate between the citizen and the law enforcement officer "engaged in the often competitive enterprise of ferreting out crime.” But in the present context, "the circumstances justifying toxicological testing and the permissible limits of such intrusions are defined narrowly and specifically ... and doubtless are well known to covered employees.”
Von Raab, 489 U.S. at 667, 109 S.Ct. at 1391, 103 L.Ed.2d at 703 (citation omitted) (quoting Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440 (1948) (first quote); Skinner, 489 U.S. at 622, 109 S.Ct. at 1416, 103 L.Ed.2d at 663 (second quote)).

. Although United States v. Knights, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), and Samson v. California, 547 U.S. 843, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006), both considered the constitutionality of searches of probationer homes, both did so under a straight reasonableness analysis under the Fourth Amendment, not utilizing a special-needs analysis similar to that done in Griffin. Knights, 534 U.S. at 117-18, 122 S.Ct. at 590-91, 151 L.Ed.2d at 504-05 (deciding that war-rantless searches of probationers may be reasonable outside the special-needs context); see also Samson, 547 U.S. at 847, 126 S.Ct. 2196, 165 L.Ed.2d at 256 (holding a condition of release "can so diminish or eliminate a released prisoner’s reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment”). Thus, an examination of these cases would not apply to our special-needs analysis.

. The timing here is an important consideration in constitutional analysis. The Iowa Constitution was passed in 1857. The Fourth Amendment to the United States Constitution was ratified in 1791 and officially adopted in 1792. Even the concept of parole would have been foreign to the statesmen who debated and created the search and seizure protections we are striving to balance against the needs of society.

. In the first case to reach the U.S. Supreme Court involving a parole question — in the form of a separation-of-powers challenge — the Court deferred to a decision by the state supreme court permitting delegation of judicial powers in the legislative creation of indeterminate sentencing as permissible under the .state constitution, further stating that it did not present a question under the Federal Constitution. Dreyer v. Illinois, 187 U.S. 71, 83-84, 23 S.Ct. 28, 32, 47 L.Ed. 79, 85 (1902) (examining an Illinois parole statute passed in 1899).

. The board of parole is independent from the department of corrections, with members appointed by the Governor and confirmed by the senate. Iowa Code § 904A.3. However, the majority of members of the board are expected to be "knowledgeable in correctional procedures and issues.” Id. § 904A.2. The board has a duty to create and review any parole programs and procedures. Id. § 904A.4(3); id. § 906.3. However, the board of corrections has rulemaking power over the administration of the parole system. Id. § 904.105(6)-(7); id. § 906.5(4).

. Because the issue was not raised here, we do not determine the effect a refusal by the parolee would have had on the search.