# IN THE SUPREME COURT OF IOWA

No. 15–0101

Filed December 23, 2016

Amended January 25, 2017

**STATE OF IOWA,**

Appellee,

vs.

**TROY RICHARD BROOKS,**

Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Rebecca Goodgame Ebinger, Judge.

The defendant seeks further review of a court of appeals decision affirming the denial of his motion to suppress in a probation revocation proceeding. **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Grant C. Gangestad and Robert G. Rehkemper of Gourley, Rehkemper & Lindholm, P.L.C., West Des Moines, for appellant.

Thomas J. Miller, Attorney General, Mary A. Triick, Assistant Attorney General, John Sarcone, County Attorney, and Mark Taylor, Assistant County Attorney, for appellee.

**MANSFIELD, Justice.**

This case involves a defendant who was on probation after having been convicted of drug offenses related to methamphetamine. The defendant's sister and father, concerned that he had relapsed, contacted his probation officer. They reported the defendant was using methamphetamine in the family home, was missing work, and had locked himself in his bedroom since the previous day. Two probation officers were dispatched to the residence. When they arrived, the father told them the defendant was upstairs and "out of his mind." With the father's consent, and without objection from the defendant, the probation officers entered the defendant's upstairs bedroom. The defendant was observed disoriented and covered in feces. He admitted he had relapsed and used methamphetamine.

The State commenced a probation revocation proceeding. The defendant filed a motion to suppress all statements and evidence obtained upon entry into his bedroom, claiming a violation of article I, section 8 of the Iowa Constitution. The district court denied the motion, and on discretionary review, the court of appeals affirmed this denial.

On further review, we also affirm the district court. We conclude the warrantless entry into the defendant's bedroom by probation officers carrying out a probation mission did not violate article I, section 8 under the circumstances presented here.

## I. Background Facts and Proceedings.

On October 22, 2013, Troy Brooks, who had a lengthy history of prior drug-related offenses, pled guilty in the Polk County District Court to conspiracy to manufacture a controlled substance (methamphetamine), a Class "C" felony in violation of Iowa Code section 124.401(1)(*c*)(6) (2013), and possession of a controlled substance, third

offense (methamphetamine), a Class "D" felony in violation of Iowa Code section 124.401(5). Sentencing took place on December 23. At that time, Brooks received consecutive sentences of up to ten years in prison on the conspiracy offense and up to five years in prison on the possession offense.

However, at the same time, the district court suspended Brooks's prison sentences and placed him on probation for two years. The sentencing order required Brooks to sign a probation agreement and otherwise submit to the supervision of the Fifth Judicial District Department of Correctional Services.

Brooks's written probation agreement included the following conditions:

> I will submit to a search of my person, property, residence, vehicle, or personal effects, at any time, with or without a search warrant or arrest warrant, if reasonable suspicion exists, by a peace officer or probation/parole officer.
>
> . . . .
>
> I shall not possess, ingest, inject or otherwise use any non-prescribed drug.
>
> . . . .
>
> I will make myself and my residence available for visits at the discretion of my supervising officer.

On September 15, 2014, Brooks's regular probation officer, Michael Evans, received a voicemail from Brooks's sister and eighty-year-old father. The voicemail indicated Brooks had been using methamphetamine in the family house and had locked himself in his bedroom since the previous day. The voicemail also stated that Brooks had been missing work due to drug use and had been concealing the results of drug tests with baking soda.

That same morning, Evans also received a phone message from the manager of a drug treatment facility Brooks had attended in the past. The manager confirmed Brooks's drug relapse and stated that Brooks was "a real mess" and Evans should address the situation quickly.

Evans was at a court hearing in Lucas County when he received the voicemails. For this reason, he could not go to the Brooks family home. Instead, Evans contacted Lance Wignall and Ryan Smith, who were also employed as probation officers by the Fifth Judicial District Department of Correctional Services. He asked that "they respond to the address because [he] was indisposed at another hearing."

Wignall and Smith arrived at the Brooks home later that day. Brooks's father opened the front door and told the officers that Brooks was upstairs and "out of his mind." He gave them permission to enter Brooks's room.[1] The probation officers knocked on Brooks's bedroom door and concluded it was locked. Brooks's father advised there was no lock on the door, so the officers surmised that Brooks had somehow barricaded himself in. Upon further knocking, the door opened.[2] The probation officers noticed a large knife on the floor that appeared to have been wedged between the door and the doorframe. It is not clear whether the knife had fallen out or Brooks had removed it.

The officers saw Brooks immediately—surprised, disoriented, and covered in fecal matter. The officers conducted a quick search of the

---

[1]At the suppression hearing, Brooks testified that he had exclusive use of the bedroom and had rented it from his father. There is no indication that the probation officers knew this beforehand.

[2]Brooks testified at the hearing that he did not consent to the officers entering his room. Wignall, however, testified that Brooks said repeatedly he was going to open the door until the door came open. The district court found that Brooks "said repeatedly that he was going to open the door, but then did not do so."

room and placed Brooks in handcuffs. Brooks admitted he had relapsed and had been using methamphetamine.

Officer Evans filed a probation violation report as a result of the September 15 incident. Prior to the probation revocation hearing, Brooks filed a motion to suppress the evidence obtained from the home visit as a violation of his rights under article I, section 8 of the Iowa Constitution.

Following an evidentiary hearing, the district court denied Brooks's motion. The court reasoned,

> The facts of this case demonstrate the important difference between searches by law enforcement officers and actions by probation officers tasked with supervising individuals in the community. Here, family members who had allowed Defendant to reside with them called Defendant's probation officer. They were scared. They needed help. They could not handle the situation by themselves and they wanted Defendant out of their home. The Defendant was "out of his mind" and had locked himself inside his room.

> The officers responded to the home as quickly as possible. The Defendant's assigned probation officer was unable to respond due to his presence at a court hearing in a different county, but he contacted probation officers who are specifically assigned to deal with emergency situations such as this one. And this was an emergency situation. An individual does not have to be nonresponsive or overdose to have an emergency. Defendant's state of mind when officers eventually made contact with him confirmed the family's concerns were valid. . . .

> . . . .

> . . . [T]he Court finds that Defendant's right to be free from unreasonable searches under Article I, section 8 of the Iowa Constitution was not infringed when probation officers entered his room on September 15, 2014 and conducted a cursory search.

The court added,

> Even if the officers' actions violated Defendant's rights under Article I, section 8 of the Iowa Constitution, the Court

would follow the reasoning in *Kain v. State*, 378 N.W.2d 900 (Iowa 1985), and find that evidence gathered illegally was not subject to exclusion in a probation revocation proceeding.

On January 9, 2015, the district court revoked Brooks's probation and imposed the original sentence of imprisonment for each offense. Brooks filed an application for discretionary review with this court and requested a stay of his incarceration. *See* Iowa R. App. P. 6.106(1).

We granted Brooks's application and transferred the case to the court of appeals. The court of appeals affirmed the district court on the basis of *Kain*. Brooks then filed an application for further review, which we granted.

## II. Standard of Review.

We review the district court's denial of a motion to suppress based on the deprivation of a constitutional right de novo. *State v. Ochoa*, 792 N.W.2d 260, 264 (Iowa 2010). We make "an independent evaluation [based on] the totality of the circumstances as shown by the entire record." *Id.* (alteration in original) (quoting *State v. Breuer*, 577 N.W.2d 41, 44 (Iowa 1998)). "We give deference to the district court's fact findings due to its opportunity to assess the credibility of witnesses, but we are not bound by those findings." *In re Pardee*, 872 N.W.2d 384, 390 (Iowa 2015) (quoting *State v. Tyler*, 867 N.W.2d 136, 153 (Iowa 2015)).

## III. Analysis.

On appeal, Brooks argues that the probation officers' entry into his bedroom violated his rights under article I, section 8 of the Iowa Constitution and that any information acquired as a result of that entry must be suppressed. The State responds that the entry was lawful, and further argues that even if it was unlawful, the exclusionary rule does not apply in probation revocation proceedings.

Article I, section 8 of the Iowa Constitution provides,

The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.

"We employ a two-step approach to determine whether there has been a violation of . . . article I, section 8 of the Iowa Constitution." *State v. Kern*, 831 N.W.2d 149, 164 (Iowa 2013) (quoting *State v. Lowe*, 812 N.W.2d 554, 567 (Iowa 2012)). "First, the defendant must show he or she has 'a legitimate expectation of privacy in the area searched.' " *Id.* (quoting *Lowe*, 812 N.W.2d at 567). "Second, if so, we must determine whether the defendant's rights were violated." *Id.* "We jealously guard our right to construe a provision of our state constitution differently than its federal counterpart, though the two provisions may contain nearly identical language and have the same general scope, import, and purpose." *State v. Jackson*, 878 N.W.2d 422, 442 (Iowa 2016).

**A. Brooks's Expectation of Privacy.** At the time of the incident, Brooks was living with his sister and father. Brooks's father—the owner of the residence—freely and voluntarily consented to the probation officers entering the home in order to check on Brooks. Nonetheless, Brooks argues he maintained a legitimate expectation of privacy in the *room* in which he was staying in his father's home.

To establish a legitimate expectation of privacy in his room, Brooks must show "(1) a subjective expectation of privacy and (2) this expectation of privacy was reasonable." *Tyler*, 867 N.W.2d at 168 (quoting *State v. Ortiz*, 618 N.W.2d 556, 559 (Iowa 2000)). "The determination of whether a person has a legitimate expectation of privacy with respect to a certain area is made on a case-by-case basis,

considering the unique facts of each particular situation." *Id.* (quoting *State v. Fleming*, 790 N.W.2d 560, 564 (Iowa 2010)).

At the hearing on the motion to suppress, Brooks testified that he had exclusive possession of the room and had been paying his father monthly rent to solely occupy the room. Brooks also testified that he believed no one had the right to enter his room without his consent, including his father.

We have held that a tenant, *unrelated* to a landlord, may have a reasonable expectation of privacy in a rented bedroom under the Iowa Constitution. *See Fleming*, 790 N.W.2d at 567. In *Fleming*, we declined to adopt the "community-living exception" used by other jurisdictions, under which a person renting a room within a single-family home has no separate expectation of privacy. *Id.* at 566–67. Instead, we reasoned that tenants in a house do not reasonably believe they are "giving up the right to privacy in their personal space." *Id.* at 567. While an individual may surrender his or her privacy in a communal space, such as a living room or a bathroom, we concluded it is reasonable that "the individual bedrooms remain private." *Id.*

The entry here was not into a communal space, but instead, into Brooks's personal bedroom. Brooks testified that he rented the bedroom from his father, although there is no evidence the probation officers knew this. We will assume for purposes of our decision that Brooks had a legitimate expectation of privacy in his bedroom.

**B. Special-Needs Doctrine.** We must now determine whether Brooks's rights under article I, section 8 of the Iowa Constitution were violated when Officers Wignall and Smith entered his bedroom. Among other things, the State argues that the probation officers' entry was justified by the special-needs doctrine. We believe it would be helpful to

begin by reviewing our recent article I, section 8 caselaw concerning searches and seizures of probationers and parolees.

In *State v. Baldon*, we concluded that a parole agreement containing a prospective consent-to-search provision is insufficient, by itself, to establish the voluntary consent necessary to justify a suspicionless search under article I, section 8 of the Iowa Constitution. *See* 829 N.W.2d 785, 802–03 (Iowa 2013). In that case, the defendant had signed a parole agreement that included a blanket consent to future searches with or without a warrant or reasonable cause. *Id.* at 787. An on-duty police officer discovered that Baldon was staying in a motel well-known for being a high-crime location. *Id.* at 787–88. A police sergeant called Baldon's parole officer and requested permission to search Baldon's motel room and vehicle pursuant to the parole agreement. *Id.* at 788. Police officers on the scene and the parole officer conducted the search together, which was "completely based on [the] agreement and nothing more." *Id.* (alteration in original). The officers discovered marijuana in Baldon's vehicle, which resulted in a charge of possession of marijuana with intent to deliver. *Id.*

On appeal, the only issue we addressed was "whether a parole agreement containing a consent-to-search clause renders suspicionless and warrantless searches of parolees reasonable under the search and seizure clause of the Iowa Constitution." *Id.* at 789–90. We did not consider whether the State's maintenance of a parole system presented "special needs[] beyond the normal need for law enforcement." *Id.* at 789 (alteration in original) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 351, 105 S. Ct. 733, 748, 83 L. Ed. 2d 720, 741 (1985) (Blackmun, J., concurring)). Further, we "largely set aside" cases dealing with probationers and instead focused primarily on parolee cases. *See id.* at

795. We held that "the search provision contained in Baldon's parole agreement does not represent a voluntary grant of consent within our constitutional meaning" and therefore the suspicionless search of Baldon's car violated article I, section 8. *Id.* at 803.

Shortly after *Baldon,* we decided another parolee case in *State v. Kern,* 831 N.W.2d at 149. In that case, Kern was on parole and had signed a parole agreement with a similar blanket consent-to-search provision. *Id.* at 155–56. A caseworker with the Iowa Department of Human Services received a complaint that marijuana was being grown, processed, and sold in the house where Kern resided. *Id.* at 156. Kern's sixteen-year-old daughter and infant grandchild occasionally stayed at the house. *Id.* The caseworker visited the home, accompanied by two police officers, and asked Kern for consent to search the house. *Id.* Kern refused, and the caseworker removed the children from the home. *Id.* Thereafter the police officers returned to the house, without Kern's parole officer, and informed Kern that the officers were going to search the house "because Kern was a parolee and had consented to a search in her parole agreement." *Id.* at 156–57. The officers found marijuana and guns in various rooms of the house and Kern was charged with four drug offenses. *Id.* at 157.

Kern challenged the police officers' search as a violation of her constitutional rights, whereas the State argued the search was justified under several exceptions to the warrant requirement. *Id.* at 157–58. We determined that no exception to the warrant requirement justified the warrantless search of Kern's home under article I, section 8 of the Iowa Constitution. *Id.* at 177. Although we ultimately concluded that it was unnecessary to decide whether the special-needs doctrine was "viable in the context of parole under the Iowa Constitution" based on the facts of

that case, we did outline the scope of the doctrine were we to recognize the existence of such an exception. *See id.* at 170.

First, we noted the "obvious limitation" that the doctrine would apply only to searches conducted by parole officers consistent with the parole mission. *Id.*; *cf. Ochoa*, 792 N.W.2d at 294–95 (Cady, J., concurring specially) (recognizing the distinction between interests unrelated to general law enforcement and interests "involving enforcement of criminal laws"). This limitation ensures that the search furthers the goals of parole rather than the interests in law enforcement. *Kern*, 831 N.W.2d at 170. Second, we recognized that the special-needs doctrine "cannot be used by police to make an end-run around the constitutional protections otherwise available to parolees." *Id.* Because the search conducted by the police officers was "instigated and dominated by the needs and interests of law enforcement," we declined to consider applying the special-needs doctrine in *Kern*. *Id.* at 172.

We subsequently addressed a warrantless search of a probationer's home by police officers in *State v. Short*, 851 N.W.2d 474 (Iowa 2014). Following a reported burglary, police officers received information that implicated the defendant, Justin Short. *See id.* at 476. Police officers obtained a search warrant for the wrong address. *Id.* Yet without getting a valid new warrant, they conducted a search of Short's apartment anyway. *Id.* at 476–77. Short was on probation for unrelated crimes. *Id.* at 477. However, Short's probation officer did not participate in the search, and it was undisputed that the search was not connected with Short's probation, but was instead "an investigatory search by law enforcement related to new crimes." *Id.* at 477.

On appeal, we considered whether law enforcement officers, "as distinguished from probation officers," may conduct a warrantless search

for investigatory law enforcement purposes of a probationer's home under article I, section 8 of the Iowa Constitution. *Id.* at 481. We held that the warrant requirement has "full applicability" to home searches of probationers by law enforcement. *Id.* at 506. Given the absence of a warrant, we reversed the denial of Short's motion to suppress, while making it clear that we were not addressing "the legality of home visits or other types of supervision by probation officers pursuant to their ordinary functions, [or] . . . the question of whether a probationer may validly consent to warrantless home searches." *Id.*

In our *Short* decision, we relied heavily upon *State v. Cullison*, 173 N.W.2d 533, 540–41 (Iowa 1970), which had invalidated a warrantless search of a parolee's home by a parole officer. *Id.* at 492–96. Although *Cullison* involved a parolee, not a probationer, we said in *Short* that "the analytic structure of *Cullison* applies with equal force to both." *Short*, 851 N.W.2d at 492. Importantly, the issue in *Cullison* was whether the parole officer could search the parolee's house for evidence "relative to the prosecution of an offense separate and apart from that upon which he had been previously granted a parole." *Cullison*, 173 N.W.2d at 540.[3]

Lastly, we returned to the special-needs doctrine in the 2015 case of *State v. King*, 867 N.W.2d 106 (Iowa 2015). Like the defendants in *Baldon* and *Kern*, Donald King was a parolee. *Id.* at 109. He had been paroled following multiple convictions for possession and intent to deliver methamphetamine. *Id.* He had also signed a parole agreement with a

---

[3]We added in *Short*,

> There is substantial authority, for instance, for the proposition that while evidence obtained through home visits, or searches by probation officers, may not be used in new criminal prosecutions, it may be used for purposes of establishing a violation of probation or parole.

851 N.W.2d at 505.

standard consent-to-search provision. *Id.* During meetings with his parole officer, King had complained about his drug treatment and generally "seemed to be losing his motivation to succeed at parole." *Id.* King's parole officer was concerned that King was either "on the verge of another relapse" or would abscond from parole. *Id.* During a home visit, the parole officer decided to check King's bedroom for signs of drug use. *Id.* at 110. He informed King of his intention to search, and King did not refuse. *Id.* The parole officer noticed a sunglasses case in King's bedroom, opened the case, and discovered two bags of marijuana. *Id.* King was charged with possession of marijuana as a result of the search. *Id.* He moved to suppress the results of the search based on article I, section 8. *Id.*

The State defended the parole officer's search as justified by the special-needs doctrine. *Id.* We first acknowledged that we had not yet applied the special-needs doctrine to warrantless searches of parolees or probationers by parole or probation officers. *See id.* at 116. However, we ultimately concluded that the special-needs exception authorized the parole search at issue. *Id.* at 126–27. We balanced three factors in reaching that conclusion: (1) the nature of the privacy interest intruded upon by the search, (2) the character of the intrusion, and (3) the nature of the governmental concerns and the efficacy of the search policy. *See id.* at 117–26.

In our *King* opinion, we noted, "A distinction exists between searches to pursue the purposes of law enforcement and those to pursue the purposes of carrying out the mission of parole." *Id.* at 122. We also stated, "The concerns that prompt the parole search in general need to be broad enough to achieve the purpose of parole, but narrow enough that the search not be arbitrary or depart from the parole mission." *Id.*

at 124. With respect to the facts at hand, we said, "The immediacy of the government concerns [was] derived from the general mission of parole supervision." *Id.* at 126.

We believe the *King* three-factor analysis supports the application of the special-needs doctrine to this *probation* case. Critically, as in *King*, this was not an entry for law enforcement purposes. Rather, two probation officers entered Brooks's bedroom after being summoned by Brooks's regular probation officer who was otherwise tied up but had received a family report of a drug relapse. The intrusion was limited. The probation officers entered the bedroom, saw Brooks's obviously disoriented condition, conducted a "cursory search" (which is not even at issue here), questioned Brooks, and arrested him for a probation violation. As the district court put it,

> The officers had reasonable suspicion that Defendant was violating the terms of his probation based upon the statements made by the family members. They came to the home, were invited in, and attempted to make contact with Defendant. This is exactly what probation officers are supposed to do.

Probationers are expected to abide by conditions of their probation, including in this case refraining from possessing or using illegal drugs. *See* Iowa Code § 907.6 (2015). Probation officers are required by statute to "supervise, assist, and counsel [a] person during the term of the person's probation." *Id.* § 907.8(1). They are to "investigate all persons referred to them for investigation by the director of the judicial district department of correctional services which employs them." *Id.* § 907.2. They are to "keep informed of each person's conduct and condition and shall use all suitable methods prescribed by the judicial district department of correctional services to aid and encourage the person to bring about improvements in the person's conduct and condition." *Id.*

Probation officers "shall make reports to the court when alleged violations occur." *Id.* Probation officers are peace officers. *Id.* This means they have authority to make arrests that the general public does not have. *See id.* §§ 804.6–.7, .9.

Close supervision of probationers furthers legitimate goals such as rehabilitating the probationer, protecting the community at large, and reducing recidivism. *See id.* § 907.6; *see also Griffin v. Wisconsin*, 483 U.S. 868, 875, 107 S. Ct. 3164, 3169, 97 L. Ed. 2d 709, 718 (1987). Consequently, the probation officer and probationer share an "ongoing relationship" that is not entirely adversarial in nature. *See King*, 867 N.W.2d at 121, 126. Probation supervision—like parole supervision— "necessarily involves" intrusion by the government as probationers assimilate to social norms. *Id.* at 121.

This is not a case like *Short*, where the probationary status of the defendant became an after-the-fact justification for a warrantless search of his residence for independent law-enforcement purposes. This was a probation mission from the beginning (when the defendant's probation officer received a call from the defendant's sister and father) until the end (when the defendant was charged with violating the terms of probation and not a separate crime).

Brooks disputes that the entry into his bedroom was performed by actual probation officers. However, the district court found otherwise, and based on our de novo review of the record, we agree with the district court.

Officer Evans was Brooks's regular probation officer. He testified that he asked two of his "coworkers"—Wignall and Smith—to respond to the calls he received from Brooks's family and from the manager of the treatment facility. Wignall, one of those coworkers, appeared at the

hearing and testified he is a probation officer employed by the Fifth Judicial District Department of Correctional Services. This was further confirmed by the district court's questioning:

> THE COURT: One follow-up question, Mr. Evans. Were all of the officers that you asked to respond in your stead, since you were in court someplace else, were they all also probation/parole officers? THE WITNESS: Yes, ma'am, they were.

For reasons not explored at the hearing, but which may have to do with reducing the risk of a misunderstanding with the public, Wignall regularly wore a police uniform with a "Polk County Sheriff" patch on the sleeve. He also carried a firearm. Yet Wignall explained that his position meant he only arrested probationers or parolees who had violated the terms of their probation or parole, even though he did have the general authority to make any arrest. His job description meant he did not write tickets or citations, did not respond to calls for service, and did not respond to calls from dispatch.

As a member of the fugitive unit in the Fifth Judicial District Department of Correctional Services, Wignall's duties differed from those of an average probation officer because he was responsible for "folks that abscond supervision" and dealt with "situations that include home visits and high-risk situations."[4] Wignall acknowledged that he did not have a list of probationers he regularly supervised and did not normally conduct traditional home visits of probationers. And the trip to the Brooks family home was not a preplanned home visit. Still, it was a probation visit, as confirmed by the facts that Brooks's regular probation officer initiated the visit and no independent criminal charges resulted from it. In sum,

---

[4]Evans belonged to the same fugitive unit, even while serving as Brooks's regular probation officer.

we agree with the district court and reject Brooks's claim that Wignall and Smith entered his room "as law enforcement officers" and for law enforcement purposes.

The record indicates that the Fifth Judicial District Department of Correctional Services has set up a separate unit of probation officers that have special training and carry firearms so they can deal with high-risk situations. In our view, this does not alter the basic analysis under *King*. Some probationers present more risks than others, for example if they have been actively using methamphetamine. Some probation-related duties are more hazardous than others. It would not make sense to adopt a rule that a probation mission ceases to be a probation mission just because the probation officer is carrying a firearm for protection. The focus should remain, rather, on the activity itself: Was the probation officer engaged in supervision of a probationer (which can include an arrest for a probation violation) or was she or he conducting a separate law enforcement investigation?

In this regard, the impromptu entry here can be contrasted with the investigative search that occurred in *Cullison*. In that case, a parole officer visited a parolee and became suspicious when the parolee refused to unlock an interior door in the parolee's apartment. *Cullison*, 173 N.W.2d at 534–35. The parole officer left the apartment, came back with a set of master keys, and ultimately convinced the parolee that he should open the locked door for the officer. *Id.* at 535. The officer found stolen merchandise in the locked room and the parolee was charged with a new offense. *Id.*

On appeal, we took no issue with the parole officer's initial entry because the parole officer went inside to determine why the parolee had not reported to work. *See id.* at 539; *see also King*, 867 N.W.2d at 122

("The initial intrusion by the parole officer in the apartment, however, was consistent with the mission of parole and was not part of the analysis that found the search of the home to be unconstitutional." (discussing *Cullison*, 173 N.W.2d at 539)). Instead, we concluded the parole officer's further search of the locked room in the apartment, for the purpose of discovering independent criminal activity, "became intertwined with the state's interest in law enforcement" and therefore required a warrant. *See King*, 867 N.W.2d at 122 (discussing *Cullison*, 173 N.W.2d at 539–40).

The entry into Brooks's bedroom arguably stands on stronger legal ground than the *King* search in several ways. In *King*, the parole officer had at most "reasonable suspicion" of a parole violation. Here, by contrast, the probation officers had more than reasonable suspicion. Brooks does not deny, in fact, that probable cause existed to believe he had violated the terms of his probation.

Furthermore, unlike in *King*, the warrantless entry here did not result in an independent prosecution on a new charge. It simply led to revocation of Brooks's existing probation.

It is true that Brooks, unlike the parolee in *King*, did not lead the officers into his bedroom. But he did not object to their coming in, either, and instead told the probation officers he was going to open the door. Shortly thereafter the door, in fact, opened.

For the reasons stated, we find the special-needs doctrine applies, and the entry into Brooks's room did not violate his rights under article I, section 8 of the Iowa Constitution. In light of this conclusion, we need not reach the State's argument that the entry into Brooks's bedroom also should be sustained under the community caretaking exception to the warrant requirement. *See State v. Crawford,* 659 N.W.2d 537, 543 (Iowa

2003) (setting forth the elements of this exception); *State v. Carlson*, 548 N.W.2d 138, 140–41 (Iowa 1996) (considering police officers' entry into a home under the community caretaking exception). Likewise, we do not reach the State's contention that the exclusionary rule does not apply in probation revocation proceedings. *See Kain*, 378 N.W.2d at 902–03 (holding that article I, section 8 does not require the exclusion of illegally obtained evidence in probation revocation proceedings).

**IV. Conclusion.**

We conclude that the warrantless entry into Brooks's bedroom did not violate article I, section 8 of the Iowa Constitution. We affirm the decision of the court of appeals and the judgment of the district court.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Cady, C.J., and Waterman and Zager, JJ., join this opinion. Appel, J., files a dissenting opinion in which Wiggins and Hecht, JJ., join.

**APPEL, Justice (dissenting).**

I respectfully dissent from the opinion of the majority in this case. As previously indicated in *State v. King,* I view the so-called special-needs exception to the warrant requirement an unfortunate development. 867 N.W.2d 106, 134–36 (Iowa 2015) (Appel, J., dissenting). I view the majority's bypass of the warrant requirement as unjustified. I also have little doubt that the exclusionary rule, under article I, section 8 of the Iowa Constitution, applies in a probation setting.

## I. Warrant Requirement as Bulwark to Liberty.

In my view, it is imperative that effective limitations be placed on search and seizures by the government. The mechanism selected by the drafters of the Iowa Constitution, article I, section 8, was the warrant requirement based upon probable cause which describes with particularity the place to be searched and the person to be seized. *See* Iowa Const. art. I, § 8.

The warrant requirement of article I, section 8 is one of the bulwarks of individual liberties in Iowa. The warrant clause accomplishes a number of purposes. By requiring that warrants be based on probable cause, the public is protected from unwarranted and arbitrary searches and seizures. History has repeatedly shown that unfettered discretion by those with power inevitably leads to abuse of authority.

Equally importantly, however, the warrant requirement limits the purposes of the search and the areas to be searched. Thus, the warrant requirement means that law enforcement must not only demonstrate probable cause that a crime has been committed, but must also limit the

search to areas that would reasonably turn up evidence of the suspected crime.

Finally, the warrant requirement is in writing. This salutary feature ensures that we have a contemporaneous record of the reasons for the search, the nature of the supporting probable cause, and any limitation imposed by the court. As can be seen, the warrant requirement does the heavy lifting of search and seizure law.

The importance of search and seizure protections was emphasized by Justice Robert Jackson after his return from Germany as Chief Prosecutor for the United States at the Nuremberg Trials. According to Justice Jackson,

> These [search and seizure provisions] are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government.

*Brinegar v. United States*, 338 U.S. 160, 180, 69 S. Ct. 1302, 1313, 93 L. Ed. 1879, 1893 (1949) (Jackson, J., dissenting).

The great backbone of our constitutional tradition—the need for effective restraints against arbitrary government enforced by fearless courts—cannot be lost because of unpleasant factual contexts in which the issues present themselves. As noted by Justice Frankfurter decades ago,

> It is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people. . . . [W]e must deal with [the defendant's] case in the context of what are really the great themes expressed by the Fourth Amendment.

*United States v. Rabinowitz*, 339 U.S. 56, 69, 70 S. Ct. 430, 436, 94 L. Ed. 653, 662 (1950) (Frankfurter, J., dissenting).

Moreover, we should not succumb to tired notions of efficiency, reasserted by some on a decennial basis, to dilute the constitutional protections. As noted by Justice Stewart, we must never forget that "the mere fact that law enforcement may be made less efficient can never by itself justify disregard of the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S. Ct. 2408, 2414, 57 L. Ed. 2d 290, 301 (1978).

Further, because of the centrality of search and seizure law to our constitutional fabric, we must, as was done at the dawning of the last century, construe the search and seizure provision in article I, section 8 "in a broad and liberal spirit." *State v. Height,* 117 Iowa 650, 657, 91 N.W. 935, 937 (1902) (quoting *People v. Forbes*, 38 N.E. 303, 305 (N.Y. 1894)). If we are to do our job properly, every one of our draft search and seizure opinions should be held up against this standard before our work is completed.

Most emphatically, search and seizure law cannot, and must not, devolve into a question of modern, pragmatic "reasonability" untethered from the warrant requirement. For starters, the language of the constitutional provision, taken in context, does not allow it. As noted by Justice Frankfurter, "One cannot wrench 'unreasonable searches' from the text and context and historic content of the Fourth Amendment." *Rabinowitz*, 339 U.S. at 70, 70 S. Ct. at 436, 94 L. Ed. at 662; *see also State v. Ochoa,* 792 N.W.2d 260, 289 (Iowa 2010).

Further, to do so lays the groundwork for unprincipled decision-making based largely on after-the-fact calculations rooted in personal philosophies. Indeed, every time a new "special needs" exception is developed or expanded, courts are rewriting the constitutional fabric of

search and seizure law to fit the court's perception of a desired public policy. The use of "reasonability" untethered to the warrant requirement as the touchstone of search and seizure law amounts to the following constitutional rule: The warrant requirement applies, unless we think it wise that it does not apply. It is a short step to say that the warrant requirement is fine, as long as there are no adverse consequences. Or, one might say, when an individual needs the protection of the warrant requirement the most, there will be an available off-the-shelf exception to avoid it. Viewing search and seizure from the viewpoint of law enforcement, courts applying the "reasonability" approach risk functioning more as an internal police commission flagging only exceptionally flagrant violations rather than as an independent judicial tribunal jealously guarding individual rights.

Of course, there have long been a few jealously guarded exceptions to the warrant requirement. For example, searches in exigent circumstances where probable cause may be present but there is no time to obtain a warrant have traditionally been upheld.

But the exceptions should be applied sparingly by the judiciary in order to fiercely guard the constitutional role of the warrant. Such fierce defense of the warrant requirement is not evident in this case. Indeed, the notion the warrant requirement is subject to only "jealously and carefully drawn exceptions," a notion which we have repeatedly stated, is notably absent in this case. *Ochoa*, 792 N.W.2d at 278 (quoting *Jones v. United States*, 357 U.S. 493, 499, 78 S. Ct. 1253, 1257, 2 L. Ed. 2d 1514, 1519 (1958)); *State v. Strong*, 493 N.W.2d 834, 836 (Iowa 1992). The majority opinion seems more interested in jealously guarding the discretion of law enforcement but not the warrant requirement.

Here is why I draw that conclusion. In *King*, we emphasized that parole was "divorced from the general interests of the state in law enforcement." 867 N.W.2d at 122 (majority opinion). Here, obviously, the "warrant team," the sworn law enforcement officers trained to arrest people and who had no relationship with parolees, can only be regarded as part of law enforcement in any functional sense. So, while *King* touted the "divorce" between parole and law enforcement, that divorce is not present here.

Further, in *King*, the majority cited *Griffin v. Wisconsin* for the proposition that "[a]lthough a probation officer is not an impartial magistrate, neither is he the police officer." *Id.* at 126 (quoting 483 U.S. 868, 876, 107 S. Ct. 3164, 3170, 97 L. Ed. 2d 709, 719 (1987)). Here, of course, the searchers were police officers in every meaningful sense of the word.

Second, *King* emphasized the "ongoing supervisory relationship" between the parole officer and the parolee. *Id.* at 122 (quoting *Griffin*, 483 U.S. at 879, 107 S. Ct. at 3171, 97 L. Ed. 2d at 721). It cites "[t]he absence of an adversarial relationship" between the parolee and the parole officer. *Id.* at 125. But here there was no ongoing relationship between the law enforcement officers who conducted the search and the parolee. Unlike in *King*, it does not matter to the majority that the law enforcement officers here were strangers to the parolee.

Third, *King* emphasized the limited nature of the holding. In *King*, the majority concluded that "parole officers have a special need to search the home of parolees as authorized by a parole agreement and not refused by the parolee when done to promote the goals of parole." *Id.* at 126. The fact that the parolee had not refused the search by a parole

officer was an integral part of the holding. *Id.* at 126–27. The majority now abandons that limitation in *King* today.

After filing a full-throated dissent in *King*, I nonetheless ended on a somewhat optimistic note, emphasizing the narrowness of the ruling. I wrote

> the majority opinion is extremely limited. It does not apply to the activities of law enforcement. It does not endorse freestanding reasonableness, a hungry beast that could threaten the warrant requirement. . . . It reserves the question of whether a parolee has a right to refuse the search.

*Id.* at 136 (Appel, J., dissenting). My optimism that the limits of *King* might hold has proved unfounded.

We are left, at least for now, with a requirement of reasonable suspicion before law enforcement officers, who happen to be organizationally part of probation bureaucracies, may conduct a warrantless search of a probationer's home. And so, defenders of a vibrant search and seizure jurisprudence under article I, section 8 of the Iowa Constitution have no choice but to once again retreat to the next position and dig in. Perhaps it is possible that the reasonable suspicion limitation may come to mean something under article I, section 8 of the Iowa Constitution. *See Ochoa*, 792 N.W.2d at 287–91. In other words, it may yet have real teeth.

If reasonable suspicion does prove to have real teeth, the consequences of today's ruling may be somewhat contained. The benefits of a contemporaneous record that arises from a warrant requirement will be lost, of course, and the substantive protection against arbitrary search and seizures will be somewhat watered down. If teeth are absent, however, our search and seizure law will slide further down the abyss of unfettered discretionary searches and seizures for

thousands of our citizens who are on probation. For them, constitutional search and seizure protection under article I, section 8 will be rendered meaningless by courts responding to perceived pragmatic considerations rather than the command of the constitution itself. If so, we will have drifted a long, long way from the declarations in *State v. Cullison* that parolees, and by implication probationers, do not suffer a diminution of constitutional protections from warrantless searches and seizures in their homes simply because of their status as parolees. 173 N.W.2d 533, 537 (Iowa 1970).

## II. Application of Exclusionary Rule in Parole Proceedings.

Because the search, in my view, was invalid without a warrant, I now address the next question, namely, whether the exclusionary rule applies in probation revocation proceedings. As noted by the parties, in *State v. Swartz*, 278 N.W.2d 22, 26 (Iowa 1979), and *State v. Kain*, 378 N.W.2d 900, 903 (1985), we held the exclusionary rule did not apply in probation determinations. In *Swartz*, we emphasized the purpose of the exclusionary rule was "to discourage unconstitutional acts by law enforcement officials." 378 N.W.2d at 23. *Kain* simply followed *Swartz* with no analysis. *Kain*, 378 N.W.2d at 902–03.

After *Swartz* and *Kain* were decided, however, we then decided *State v. Cline*, 617 N.W.2d 277 (2000), abrogated in part on other grounds in *State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2001). In *Cline*, we addressed the argument that the sole purpose of the exclusionary rule was to deter police misconduct. 617 N.W.2d at 289. As is apparent, the notion that the sole purpose of the exclusionary rule is to deter misconduct was the centerpiece in *Swartz*, 278 N.W.2d at 26, and its follower *Kain*, 378 N.W.2d at 903. We also considered the

argument that the rule has no ameliorative effect on the judicial or legislative branches. *Cline*, 617 N.W.2d at 289–90.

In *Cline*, we disagreed with both propositions. *Id.* Unlike in *Swartz*, we stressed that the exclusionary rule serves purposes beyond deterrence of police misconduct. *Id.* at 289. We noted that in our early search and seizure cases we emphasized the exclusionary rule "provided a remedy for a constitutional violation and protected judicial integrity." *Id.*; *see also State v. Sheridan*, 121 Iowa 164, 168, 96 N.W. 730, 731 (1903) (stating that to admit illegally obtained evidence is to "emasculate the constitutional guarantee").

Thus, we emphatically stated in *Cline* that the exclusionary rule was constitutionally based, not simply a judicially created remedy, and that the exclusionary rule protects the integrity of the court by refusing to admit illegally obtained evidence. 617 N.W.2d at 289–90. As a result, we joined a growing number of states declining, under state search and seizure constitutional provisions, to adopt the so-called "good faith" exception to the exclusionary rule created by the United States Supreme Court in *United States v. Leon*, 468 U.S. 897, 922, 104 S. Ct. 3405, 3420, 82 L. Ed. 2d 677, 698 (1984). *Cline*, 617 N.W.2d at 289–93; *see, e.g.*, *State v. Marsala*, 579 A.2d 58, 66–68 (Conn. 1990); *Gary v. State*, 422 S.E.2d 426, 428–29 (Ga. 1992); *State v. Lopez*, 896 P.2d 889, 902 (Haw. 1995); *State v. Guzman*, 842 P.2d 660, 671–72 (Idaho 1992); *State v. Novembrino*, 519 A.2d 820, 854–57 (N.J. 1987); *State v. Gutierrez*, 863 P.2d 1052, 1067 (N.M. 1993); *Commonwealth v. Edmunds*, 586 A.2d 887, 905 (Pa. 1991); *State v. Oakes*, 598 A.2d 119, 126–27 (Vt. 1991); *State v. Scull*, 862 N.W.2d 562, 572 (Wis. 2015).

In states that emphasize judicial integrity and the constitutional nature of the exclusionary rule, the exclusionary rule has been applied in

probation and parole settings.  The reasoning is obvious.  In *State v. Marquart,* the New Mexico Court of Appeals considered whether the search and seizure provision of the New Mexico Constitution required the exclusionary rule to be applied in probation revocation proceedings.  945 P.2d 1027, 1031 (N.M. Ct. App. 1997).  The *Marquart* court noted that the New Mexico Supreme Court had rejected a good-faith exception to the exclusionary rule in *Gutierrez,* 863 P.2d at 1067.  945 P.2d at 1031.  It further noted that in doing so, the New Mexico Supreme Court emphasized that the exclusionary rule is not a "mere 'judicial remedy'" but instead was a rule "to effectuate . . . the constitutional right of the accused."  *Id.* (quoting *Gutierrez,* 863 P.2d at 1067).  The *Marquart* court held the exclusionary rule applied in probation revocation proceedings. *Id.*

In *State ex rel. Juvenile Department v. Rogers,* the Supreme Court of Oregon considered the application of the exclusionary rule under Oregon's constitutional provision related to search and seizure in probation revocation proceedings.  836 P.2d 127, 129 (Or. 1992).  The Oregon court, also emphasizing the "personal right to be free from an unlawful search and seizure," found the exclusionary rule applied in probation proceedings.  *Id.* at 129–30.  Similar reasoning with comparable results may be found in *State v. Dodd,* 419 So. 2d 333, 335 (Fla. 1982), *Mason v. State,* 838 S.W.2d 657, 659 (Tex. Ct. App. 1992), and *Howard v. State,* 308 S.E.2d 424, 425 (Ga. Ct. App. 1983).

In my view, the logic of *Cline* compels application of the exclusionary rule in parole and probation proceedings.  Under *Cline,* the exclusionary rule is not merely a judicially created remedy but enforcement of a personal constitutional right.  617 N.W.2d at 289.

Further, the integrity of the court is equally affected by introduction of tainted evidence in a parole proceeding as it is in any other case.

### III. Conclusion.

For the above reasons, I would conclude that the search without a warrant in this case was invalid under article I, section 8 of the Iowa Constitution.  Further, as a result of the constitutional violation, evidence obtained from the search is inadmissible in a probation revocation proceeding.  As a result, I would reverse the decision of the district court in this case.

Wiggins and Hecht, JJ., join this dissent.