# IN THE COURT OF APPEALS OF IOWA

No. 23-1409
Filed December 18, 2024


**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**ROBERT LEE MILLER III,**
    Defendant-Appellant.
_____


Appeal from the Iowa District Court for Polk County, Lawrence P. McLellan, Judge.


A defendant appeals his convictions for vehicular homicide and serious injury by vehicle by operating while intoxicated.  **AFFIRMED.**


Martha J. Lucey, State Appellate Defender, and Josh Irwin, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.


Heard by Tabor, C.J., Greer, J., and Danilson, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**TABOR, Chief Judge.**

After a seven-day trial, a jury convicted Robert Miller III of vehicular homicide by operating while intoxicated (OWI) and serious injury by vehicle by OWI.[1]  On appeal, Miller claims that the district court erred in denying his motion to suppress because police unconstitutionally searched his hospital rooms and then included information from those searches—and omitted other material evidence—in the warrant application for a sample of his blood.  He also claims that the State failed to lay proper foundation under Iowa Code section 321J.11(1) (2022) for admission of his alcohol test result because it did not show that a nurse used "new equipment" to draw his blood.  Miller seeks a new trial on all his convictions, "or at a minimum all convictions for offenses including elements of intoxication or recklessness."  Finding the district court properly admitted evidence of Miller's blood alcohol content, we affirm.

## I.      Facts and Prior Proceedings

On a Tuesday afternoon in December 2022, Miller and his friend Keith Jones spent hours at the Wicked Rabbit Sports Bar in Des Moines.  Surveillance cameras inside the bar captured Miller taking shots of liquor, drinking beer, and playing pool.  Miller and Jones left the bar shortly before 6:00 p.m. and exited the parking lot at the same time.  Miller was driving a black Genesis sedan; Jones was driving a black SUV.  After Miller and Jones left the bar, a string of witnesses saw the Genesis and the black SUV travelling "at a very high rate of speed" and

---

[1] The jury also convicted Miller of vehicular homicide by reckless driving, vehicular homicide by drag racing, and serious injury by reckless driving.

"weaving in and out of traffic."[2]  As they drove north on Fleur Drive towards Gray's Lake, Jones's black SUV "went over in the right lane" while Miller's Genesis "stayed in the left lane."  Then Miller "cut off the black SUV" by changing lanes, "lost control," and "went over the median into the southbound lane."

At the same time, M.D.C. was driving south on Fleur with her eight-year-old son and four-year-old nephew, M.F., in the backseat of her Honda Accord.  After she passed the entrance to Gray's Lake Park, she saw a "black vehicle crossing over the median."  The crash happened "so fast" that she could not react.  M.D.C. recalled, "At that point, . . . I knew I had been hit, and I looked back because I wanted to make sure the boys were okay. . . .  And I remember looking at my leg and I could see my bone underneath the skin."  Then she realized she was trapped in the driver's seat.  Bystanders helped pull the two boys out of the car and stayed with them until first responders arrived at the scene.

Ambulances transported M.D.C. and the two boys from the crash scene to hospitals.  M.D.C. suffered severe injuries in the crash, including a broken spine, a shattered knee, internal bleeding, and ruptured intestines.  But fortunately, she survived.  Her son also survived with bruising and a dislocated collar bone.  Four-year-old M.F., however, was not so lucky—he suffered multiple blunt force injuries in the crash that resulted in his death at the hospital.

Miller's Genesis struck M.D.C.'s car with such force that the Genesis split in half.  Data from the vehicle showed that Miller was driving between 108 and 114

---

[2] Several surveillance cameras also captured the two vehicles along their route after Miller and Jones left the bar.

miles per hour in the last five seconds before the crash.[3] One witness recalled, "I saw what I can only describe as an explosion of car parts. It was like a Hollywood movie. And a piece of a car was thrown up in the air." After the crash, Miller was "laying in the middle of the median." According to a bystander, he "was lying there gasping for air. . . . [H]e was a little bit out of it at first, and then when I started talking to him, he started to come around." His only visible injury was "bleeding on his hands."

An ambulance transported Miller from the crash scene to the hospital. According to a firefighter who attended to him in the ambulance, "He was alert, but he was disoriented, so he could answer some questions. He would be able to tell me his name, his birth date, but then he'd be confused. He would say, 'What's going on? What happened?'" After arriving at the hospital, Miller was initially seen by medical personnel in the trauma bay. He was then transported on a gurney to a room in the emergency department.

Des Moines Police Officer Brian Foster went to the hospital to investigate whether Miller showed signs of impairment.[4] Officer Foster stayed in the hallway outside Miller's room in the emergency department for about five minutes "waiting for the nursing staff to finish their initial work." Then, he entered the room to speak with Miller. Once inside the room, Officer Foster introduced himself, told Miller he wasn't under arrest, and read *Miranda* warnings. Miller was wearing a C-collar and lying on a backboard, so he "wasn't able to move around." The officer then

---

[3] The speed limit was 40 miles per hour on the section of Fleur Drive where the crash happened.

[4] Officer Foster did not respond to the crash scene.

asked Miller if he wished to speak with him. Miller answered, "No, yes, I mean." Officer Foster replied, "okay, no problem at all," and began questioning him about the crash. Miller said he didn't know what happened but admitted that he "had some drinks" that day. Miller also said he was in pain and could "barely breathe," so he couldn't give a preliminary breath test.[5] Officer Foster asked Miller what time he had drinks that day. Miller answered, "Twelve, maybe." Miller also told Officer Foster that he drives a Genesis.

After that interaction, Officer Foster left Miller's room.[6] He then spoke over the phone with another Des Moines police officer, Brian Kelley, who drafted a search warrant application for samples of Miller's blood, urine, and breath. While drafting the application, Officer Kelley also spoke with Officer Slawomir Blondowski, who responded to the crash scene and briefly spoke to Miller in the ambulance before he arrived at the hospital. After a Polk County judge authorized the warrant for a blood sample, Officer Kelley delivered it to Officer Foster at the hospital. At that time, Miller had been moved to a room in the critical care unit. Officer Foster followed Miller to that room.

Molly Froehle, a medicolegal death investigator and registered nurse from the Polk County medical examiner's office, arrived at the hospital shortly after 11:00 p.m. to obtain the blood sample from Miller. Officer Foster stayed in the room during the blood draw. After Froehle completed the blood draw, Officer

[5] Officer Foster testified that at that point, he knew medical personnel suspected Miller had "some spinal fractures," but he "didn't know anything additional to that" about Miller's injuries.
[6] Before he left the room, Officer Foster took off his body camera and set it to the side of Miller's bed. The camera was facing Miller and continued video recording while Foster was outside the room.

Foster asked Miller more questions about the crash. In response, Miller told Officer Foster that he didn't "recall who he was with or what happened with the accident," but he remembered that "he had been drinking at a bar someplace on the south side," and "typically when he gets drunk like he did . . . he would call someone to drive his car for him."[7] The toxicologist who tested Miller's blood sample found an alcohol concentration (BAC) of 0.066 at the time of the blood draw—more than five hours after the crash.

The State charged Miller with five counts for causing the crash that killed M.F. and severely injured M.D.C.—(1) vehicular homicide by operating while intoxicated (OWI), a class "B" felony in violation of Iowa Code section 707.6A(1); (2) vehicular homicide by reckless driving, a class "C" felony in violation of section 707.6A(2)(a) and (c); (3) vehicular homicide by drag racing, a class "D" felony in violation of section 707.6A(3); (4) serious injury by vehicle by OWI, a class "D" felony in violation of section 707.6A(4); and (5) serious injury by reckless driving, a class "D" felony in violation of section 707.6A(4). Miller pleaded not guilty.

Miller moved to suppress the statements he made to Officer Foster at the hospital and all evidence Officer Foster obtained by entering his hospital rooms, including the search warrant for the blood draw and the blood alcohol test result. Miller further sought to exclude his blood alcohol test result from evidence by arguing that the State did not lay the required foundation under Iowa Code section 321J.11(1). Officers Foster, Kelley, and Blondowski, along with Froehle and the

---

[7] Defense counsel conceded at the motion to suppress hearing that these additional incriminating statements Miller made to Officer Foster in the critical care unit room were not included in the search warrant application because "the search warrant had already been prepared and obtained at that point."

toxicologist who tested Miller's blood sample, testified at the suppression hearing. Officer Blondowski and Officer Foster's body camera videos showing their interactions with Miller on the night of the crash were also admitted into evidence at the hearing.

After the hearing, the district court denied Miller's motion to suppress his statements to Officer Foster and the blood draw evidence, finding that Foster did not violate Miller's *Miranda* rights, that Miller did not have a reasonable expectation of privacy in his room in the emergency department, and that the warrant application established probable cause to seize Miller's blood.[8]  The court also ruled that it had "no choice but to exclude the use of the blood test results unless the State can establish the . . . swab used [for the blood draw] was sanitary, sterile, and new."

A jury heard Miller's case in May 2023.  After an offer of proof, the court let the State introduce Miller's blood alcohol test result into evidence.  The State also offered—without defense objection—photos of Miller taken by a crime scene investigator at the hospital and excerpts from Officer Foster's body camera videos showing his interactions with Miller in the emergency department and critical care unit rooms—including Miller's admissions to drinking.

The jury found Miller guilty of all charges.  The district court entered judgment and sentenced Miller to 25 years imprisonment for vehicular homicide by

---

[8] The court granted Miller's motion to suppress statements he made after invoking his right to counsel, as well as the toxicologist's retrograde extrapolation analysis of Miller's blood sample, which estimated that his BAC at the time of the crash was between 0.118 and 0.197.

OWI and 5 years imprisonment for serious injury by vehicle by OWI, running consecutively to one another.[9]  Miller appeals.

## II.  Scope and Standards of Review

"We review suppression rulings raising constitutional questions de novo." *State v. Harbach*, 3 N.W.3d 209, 217 (Iowa 2024).  But in reviewing a challenge to the sufficiency of a search warrant, "we do not make an independent determination of probable cause."  *Id.*  Instead, "we review the information actually presented to the judge and determine whether the issuing judge had a substantial basis for concluding that probable cause existed."  *Id.* (quoting *State v. Baker*, 925 N.W.2d 602, 613 (Iowa 2019)).

"When the admission of evidence depends on the interpretation of a statute, we review for correction of errors of law."  *State v. Palmer*, 554 N.W.2d 859, 864 (Iowa 1996).

## III.  Analysis

Miller raises two issues on appeal.  First, he claims that the district court erred in denying his motion to suppress.  That claim has two layers: Miller contends (1) the State obtained evidence by unconstitutionally searching his hospital rooms and (2) the search warrant application for his blood sample included prohibited information from those searches and omitted other material information.  Second, he claims that the State failed to lay the required foundation under Iowa Code section 321J.11(1) for admission of his blood alcohol test result into evidence

---

[9] The court merged the convictions for vehicular homicide by reckless driving and vehicular homicide by drag racing into the vehicular homicide by OWI conviction. The court also merged the serious injury by reckless driving conviction into the serious injury by vehicle by OWI conviction.

because it did not establish that "new equipment" was used to take the blood draw. We will address each claim in turn.

## A.  Suppression Claims

### 1.  *Hospital Room Search*

Miller first argues that Officer Foster, by entering his hospital rooms without a warrant, performed a search in violation of the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution.[10]  He claims that Officer Foster's warrantless entries were unreasonable searches under both the trespass test and the expectation-of-privacy test.  And he asserts that "all evidence stemming from those searches—including photographs, video, observations, and Miller's statements—should be suppressed."[11]

The Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution "safeguard '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'"  *State v. Abu Youm*, 988 N.W.2d 713, 718 (Iowa 2023) (alteration in original) (quoting U.S. Const. amend. IV).  Warrantless searches are per se unreasonable, unless one of the narrow exceptions to the warrant requirement exists.  *State v. Freeman*, 705 N.W.2d 293, 297 (Iowa 2005).

The question before us is whether Officer Foster's entries into Miller's hospital rooms were searches in the first place.  We look for an answer through two approaches.  Under the trespass test, when the State "obtains information by

---

[10] Miller doesn't argue for a separate Iowa constitutional analysis

[11] Because Miller only addresses the search warrant for the blood draw without elaborating on his claim that other evidence should have also been suppressed, we will focus our analysis on the blood draw evidence.

physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred." *Florida v. Jardines*, 569 U.S. 1, 5 (2013) (cleaned up). Under the expectation-of-privacy test, a search occurs when the State intrudes upon an area in which the defendant has a subjective expectation of privacy which is objectively reasonable. *See State v. Brooks*, 888 N.W.2d 406, 411 (Iowa 2016). This determination "is made on a case-by-case basis, considering the unique facts of each particular situation." *Id.* (citation omitted).

A plurality of our supreme court adopted the trespass test in *State v. Wright*, holding that "the expectation-of-privacy test is relevant only to the question of whether a seizure or search was unreasonable within the meaning of article I, section 8 and not whether a seizure or search has occurred." 961 N.W.2d 396, 414 (Iowa 2021). But—as Miller acknowledges in his brief—because a majority of the court did not join that portion of the plurality opinion, the expectation-of-privacy test is still a viable approach to determining whether a search has occurred under article I, section 8 of the Iowa Constitution. *See id.* at 420 (Appel, J., concurring specially).

Because Miller's arguments under the two approaches largely overlap, we will apply the expectation-of-privacy test.[12] Starting with the first prong of that test, Miller contends that he had a subjective expectation of privacy in his hospital rooms because he "was lying on a bed in a state of undress"; his "property was

---

[12] The State also challenges error preservation as to Miller's trespass argument because he did not make that argument in his motion to suppress. Because we choose to evaluate Miller's challenge under the expectation-of-privacy test, we need not reach this question of preservation.

there"; he "remained in the hospital for two nights, presumably eating and sleeping in his room"; and he "was advised by medical staff he had authority to exclude others." He also challenges the district court's conclusion that, by speaking with Officer Foster and not objecting to the officer's entry, Miller did not establish he had a subjective expectation of privacy.

As the State points out, only Officer Foster's observations and Miller's statements he made in his room in the emergency department were included in the search warrant application.[13] So we consider only Miller's reasonable expectation of privacy in that room—not in the room he was moved to in the critical care unit. Miller was not an overnight guest in the room in the emergency department, and he did not know how long he would be staying in the hospital when Officer Foster entered that room. What's more, he did not ask anyone to leave that room, nor did he decline to speak with Officer Foster after being advised of his *Miranda* rights. He also did not ask anyone to close the door, which was open when Officer Foster entered and remained open while they spoke. As the State further points out, Miller's property was in the room because hospital staff brought it there. And he was "in a state of undress" because a firefighter had cut off his clothes in the ambulance to check for injuries—not because he believed the room was private enough to disrobe. Under these circumstances, we find that

---

[13] Miller's counsel conceded this point at oral argument.

Miller failed to establish he had a subjective expectation of privacy in his room in the hospital's emergency department.

As for the second prong, Miller contends that his expectation of privacy was objectively reasonable because his room in the emergency department had walls and a door, and he had some authority to exclude people from the room. On this point, he claims that this case is distinguishable from *State v. Lomax*, 852 N.W.2d 502 (Iowa Ct. App. 2014), which addressed whether a patient can have an objectively reasonable expectation of privacy in an emergency room. In *Lomax*, we held that "while a patient has an expectation of privacy in their belongings brought into the emergency room, no such expectation of privacy exists in the trauma center locale, which is under the exclusive control of the hospital staff." 852 N.W.2d at 506. Thus, we concluded that Lomax's Fourth Amendment rights were not violated when a police officer entered the hospital's trauma center, "which he described as 'a big, open bay' divided by curtains," and "detected an odor of alcohol arising from the area in which Lomax was laying." *Id.* at 505–07.

True, the emergency department room in which Miller was treated had four walls and a door. But the State argues that layout does not distinguish this case from *Lomax*, because "the wall and door that separated [Miller's] hospital room from the open bay were made of transparent glass," and the curtain on the glass wall "was never drawn over the doorway (nor was the door closed) at any point when Officer Foster entered that room." And according to the State, "[n]o patient in an emergency ward can reasonably expect to have any right to exclude hospital

employees or others who play a role in emergency response—including police officers."

While we agree with Miller that the layout of his room in the emergency department differed from the "big, open" trauma center bay in *Lomax*, we do not find that distinction dispositive. Like the officer in *Lomax*, Officer Foster went to the hospital to determine whether probable cause existed to obtain a blood sample; he entered the area of the emergency department where Miller was being treated without objection from hospital staff; and he observed signs of Miller's intoxication after he entered that area. *See id.* at 504–05. Under these circumstances, we reach the same conclusion as we did in *Lomax*. Miller had no objectively reasonable expectation of privacy in his room in the hospital's emergency department. Thus, Officer Foster did not violate Miller's constitutional rights when he entered that room, observed signs that Miller was intoxicated, and elicited incriminating statements from him.[14]

### 2. Omission from Search Warrant Application

Next, Miller argues that the police intentionally or recklessly omitted material information from the search warrant application for his blood sample. "Affidavits included in search warrant applications are presumed to be true." *Harbach*, 3 N.W.3d at 218. "To overcome that presumption, a defendant challenging the veracity of a warrant application must make a 'substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit.'" *Id.* (quoting *Franks v.*

---

[14] Miller does not appeal the district court's ruling that Officer Foster did not violate his *Miranda* rights at the hospital.

*Delaware*, 438 U.S. 154, 155–56 (1978)). "A defendant may also challenge the warrant application as intentionally omitting material facts that, if included, would cast doubt on the existence of probable cause." *Id.*

When Officer Kelley was drafting the search warrant application for Miller's blood sample, Officer Foster told him that Miller admitted drinking earlier that day and that he had "bloodshot" and "watery eyes," but he did not have slurred speech and did not smell of alcohol. Officer Kelley also spoke with Officer Blondowski, who responded to the crash scene and briefly spoke to Miller in the ambulance before he arrived at the hospital. Blondowski gave Kelley a description of the crash based on information bystanders communicated to law enforcement.[15] Blondowski also told Kelley that Miller "was found outside the vehicle."

The search warrant application specified that Miller had "bloodshot eyes," "watery eyes," and "judgment impaired,"[16] and that these observations began at "approximately 1930." The application also shared that Miller was "unable to do" standardized field sobriety tests and admitted to "drinking at noon." The narrative of the application stated:

> The following observations and conclusions for a traffic violation were made by these officers at the scene:
> The suspect was travelling at a high rate of speed drag racing with an [unidentified] vehicle. He was operating a black 2022 Genesis G 70 Base bearing Iowa plate ITL969 (VIN number KMTG34TA6NU085803). The suspect vehicle lost control, crossed the center median, and struck another vehicle.

> Officers know Suspect was <u>operating</u> the motor vehicle because:

---

[15] None of the responding officers personally witnessed the crash.

[16] At the suppression hearing, Officer Kelley testified that he included the "judgment impaired" factor in the application based on "the fact that [Miller] was drag racing with another vehicle at a high rate of speed in thick traffic and [lost] control of his vehicle."

> The suspect was located outside of his vehicle. He admitted to being the sole occupant but didn't recall driving. The vehicle was registered to the suspect and an Iowa State Patrol traffic citation issued to the suspect in September of 2022, with his information and the 2022 Genesis G 70 Bases' information on it, was located within the 2022 Genesis G 70 Base. The suspect admitted to drinking alcoholic beverages around noon but did not recall anything else after that.

A Polk County judge reviewed the application and authorized the search warrant.

Miller claims that Officers Blondowski, Foster, and Kelley intentionally or recklessly omitted material information from the application—namely, "that the crash was severe enough to split Miller's car in half, that Miller was ejected and badly injured, that he was in pain when he was observed by Foster, that he was having trouble breathing and speaking, that he could not stand, [and] that he was under sedation." He contends that "[h]is physical condition and the fact he was under medication both account for his alleged bloodshot, watery eyes, and gave necessary context to why he 'could not perform' field sobriety tests as indicated but unexplained in the application." Thus, according to Miller, "the application misled the judge" and "produce[d] the same practical effect as an affirmative misstatement that Miller was physically fine, but suspected of intoxication."

Miller also argues that the corrected search warrant application would not establish probable cause to search his blood.

> If the court finds that any misstatements or material omissions were made either intentionally or with reckless disregard for the truth, the false statements are excised, the omitted statements are added, and the affidavit's remaining content is examined to determine whether it establishes probable cause to support issuing the search warrant.

*Harbach*, 3 N.W.3d at 218. Miller claims that "[r]emoving the information obtained from the unconstitutional searches—that [he] had bloodshot, watery eyes and

admitted to drinking several hours before the crash—leaves only that [he] was driving at a high rate of speed and crashed." He also alleges that "[e]ven if the information obtained during the searches remains, adding the omitted information renders unreasonable any inference there was probable cause to believe a sample of Miller's blood would reveal evidence he had operated a motor vehicle while intoxicated."

Having already found that Officer Foster's observations and Miller's admission to drinking while he was in the emergency department room were not fruits of an unconstitutional search, we decline Miller's invitation to excise that information from the warrant application. And while including information about the severity of the crash and Miller's injuries would have given the reviewing judge potential alternative explanations for Officer Foster's observations, "[a]n officer is not required to include all facts in the warrant application, even those exculpatory to the defendant." *Id.* at 222. "The judge only needs to receive the information necessary to determine whether probable cause exists under the totality of the circumstances." *Id.* at 223. Probable cause exists when "a person of reasonable prudence would believe . . . evidence of a crime could be located" in the place to be searched. *State v. Weir*, 414 N.W.2d 327, 330 (Iowa 1987).

Nor does the record support Miller's claim that the officers "intentionally or recklessly omitted information about [Miller]'s physical condition in an attempt to mislead the judge." *Harbach*, 3 N.W.3d at 223. Officer Foster's "observation of bloodshot and watery eyes does not become misleading simply because there may be an alternate explanation that was not explicitly included in the warrant application." *Id.* None of the officers personally witnessed the crash. And Officer

Kelley testified that he was unaware Miller's vehicle split in half or that Miller was ejected from the vehicle.

In sum, Miller has not shown that the officers intentionally or recklessly omitted material information from the search warrant application. And even with more information included, the totality of the circumstances in the application would have provided the issuing judge with a substantial basis for concluding that probable cause existed to issue the warrant for Miller's blood. *See Baker*, 925 N.W.2d at 614 ("We draw all reasonable inferences to support the judge's finding of probable cause and decide close cases in favor of upholding the validity of the warrant."). The district court correctly denied Miller's motion to suppress his blood alcohol test result based on his challenge to the search warrant application.

## B. Foundation for Blood Evidence

Second, Miller argues that the State failed to lay proper foundation for admission of his blood alcohol test result into evidence. He points to this final sentence in Iowa Code section 321J.11(1): "Only *new equipment* kept under strictly sanitary and sterile conditions shall be used for drawing blood." (emphasis added).[17] That sentence, according to Miller, sets the foundational requirements for admission of the test results. And the State bears the burden to show

---

[17] The predecessor version of the statute mandated: "Only *new, originally factory wrapped, disposable syringes and needles*, kept under strictly sanitary and sterile conditions shall be used for drawing blood." Iowa Code § 321B.4 (1981) (emphasis added); *State v. Charlson*, 154 N.W.2d 829, 832 (Iowa 1967). Section 321J.11(1) replaced the italicized portion of that statute with the term "new equipment." Miller argues that change signaled the legislative intent for section 321J.11(1) to apply to all equipment used in a blood draw. We agree. *Cf. State v. Binkley*, 201 N.W.2d 917, 919–920 (Iowa 1972) (finding under the former language of section 321B.4 that "the legislature implied by omission the vial need not be sterile").

compliance with those requirements. *See State v. DeBerg*, 288 N.W.2d 348, 350 (Iowa 1980). In Miller's view, the State did not meet its burden to prove that "new equipment" was used to draw his blood because it could not show the expiration dates for the disinfecting swab, needle, syringe, and transfer device taken from a supply drawer in Miller's hospital room in the critical care unit.[18] Miller maintains that "literal compliance" is required for blood test evidence to be admissible. *Id.* (quoting *State v. Boner*, 186 N.W.2d 161, 163 (Iowa 1971)). And failure to comply is grounds for reversing his conviction. *Id.* (citing *State v. Wallin*, 195 N.W.2d 95, 98 (Iowa 1972); *State v. Shelton*, 176 N.W.2d 159, 161 (Iowa 1970)).

The State disputes that proof-of-expiration-date is a foundational requirement under section 321J.11(1). In its interpretation, "new" means "unused" without showing that any expiration date on the equipment had not passed. Beyond the definition of new, the State challenges Miller's reliance on the literal-compliance standard from *DeBerg*, *Boner*, *Wallin*, and *Shelton*. To define "new," the State argues, "[t]he better rubric is substantial compliance, as explained and adopted in *State v. Charlson*." *See* 154 N.W.2d at 835.[19]

---

[18] The state-issued blood collection kit that Officer Foster provided nurse Froehle carried an expiration date that had not expired. But Froehle only used the blood storage vials (vacutainer tubes) from that kit. She testified that the Polk County medical examiner's office "never used the collection devices within the kit because they are not very safe" for the person performing the blood draw.

[19] Later cases distinguish *Charlson* because that driver requested a blood test, so the implied-consent statute did not govern. *See Wallin*, 195 N.W.2d at 97. In a similar vein, we question whether the foundational requirements in the implied-consent chapter apply to Miller's blood draw obtained through a search warrant issued under Iowa Code chapter 808, not chapter 321J. But because this distinction was not argued, we assume section 321J.11(1) applies.

Before settling the parties' debate, we turn to the facts of the blood draw. Just after 10:00 p.m. on the night of the crash, Des Moines police obtained a search warrant for Miller's blood under Iowa Code chapter 808. Nurse Froehle testified at the suppression hearing that she ensured that the warrant was signed by a judge before she gathered the equipment to perform the blood draw. Under questioning by defense counsel, Froehle testified that she could not "ascertain" whether the swab she used "was new or expired." Following the suppression hearing, the district court ruled that it had "no choice but to exclude the use of the blood test results unless the State can establish the . . . swab used [for the blood draw] was sanitary, sterile, and new."

During the State's offer of proof at trial, Froehle testified that she did not know the brand names, lot numbers, or expiration dates of the disinfecting swab, needle, or syringe she used for Miller's blood draw, nor did she keep their packaging. But she recalled that all the items were in their original, sealed packages before she used them. And as for the swab she used, she testified, "I cannot state whether it was expired. It was new because it was packaged. So when I opened it, therefore it is new."

Following that offer of proof, the court ruled that the State met the foundational requirements of section 321J.11(1), reasoning:

> As I understand, there is a blood kit that Officer Foster had. . . . My understanding is the blood kits have an expiration date. . . . [I]n this case, the expiration date . . . indicated that the blood kit that Officer Foster had had not expired . . . .
>
> . . . .
>
> So the issue boils down to whether the instruments that were used—and the key instruments are the needle, the syringe, the transfer device, and in this case, the swab. Based upon the

testimony that I've heard today, I believe the State has established that they were all new. The packaging, as I understand from Ms. Froehle, . . . is for the purpose of sanitary and sterile conditions.

. . . .

And so, I'm finding that the necessary foundation has been laid to establish that these items, the needle, syringe, and transfer device, and swab were new and kept under sanitary and sterile conditions.

During her testimony before the jury, Froehle produced—as demonstrative exhibits—a transfer device, needle, and syringe like the ones that she used during Miller's blood draw. She obtained these items from the emergency department of the hospital where Miller was treated in December 2022. The packaging for the needle had a date of September 20, 2022, printed on it next to an hourglass symbol. Froehle testified that "could be" an expiration date, but it might have been the manufacturing date. But the two other items she produced bore dates that had not yet occurred, next to the same hourglass symbol.

Highlighting that testimony, Miller contends that "[t]he State failed to establish compliance with section 321J.11(1), because it did not establish equipment used to draw Miller's blood was new." That challenge, as the State notes in its routing statement, raises an issue of first impression regarding the meaning of "new equipment." Neither the code nor our case law defines "new equipment" as used in the statute. Without an official definition, "we construe the statute according to the term's ordinary meaning." *State v. Boone*, 989 N.W.2d 645, 650 (Iowa 2023).

Citing the Merriam-Webster dictionary, Miller asserts that the ordinary meaning of "new" is "having recently come into existence." And, according to Miller, "expired" is an antonym to "new." Thus, Miller urges that "to establish it

used 'new equipment' for a blood draw as required by section 321J.11(1), the State must at minimum establish that equipment was not expired." Based on Froehle's testimony about the equipment's unknown expiration dates and the State's "failure to produce the equipment used or otherwise memorialize its compliance with section 321J.11(1)," Miller argues that his blood alcohol test result was inadmissible.

The State counters that "Miller's argument creates a new requirement for foundation that does not appear anywhere in the text of section 321J.11(1), nor in any of the cases that apply any version of section 321J.11(1) or its predecessors." And, according to the State, "the evolution of the statute makes it clear that no such requirement exists." The State urges that Froehle's testimony that she removed all the blood-draw items from the factory packaging showed the equipment was "new" under section 321J.11(1). The State insists that the antonym of "new" is "used" under the statute. To illustrate that point, the State compares the blood-draw equipment to a new car that has been on a dealer's lot for years. In the State's analogy, that car will "remain 'new' up until the moment that it is sold for consumer use."[20] The State also points out that none of the cases Miller cites discussing the statute's foundational requirements mention a "proof-of-expiration-date requirement." *See Binkley*, 201 N.W.2d 917; *Shelton*, 176 N.W.2d 159; *DeBerg*, 288 N.W.2d 348. In the State's estimation, "[t]he best way to resolve this

---

[20] Miller responds that "analogizing to a product which includes an expiration date (milk, for example), shows the fatal flaw in the State's position. No reasonable person would believe milk is 'new,' even if it is still on the store shelf and unopened, after its expiration date has passed."

case is to reject Miller's proposed definition of the term 'new equipment' in section 321J.11 and hold that equipment is new if it has never been used."

As for the evolution of the statute, the State contends that when the legislature deleted the requirement that any equipment used for a blood draw must be "originally factory wrapped" in adopting section 321J.11(1), it "envisioned situations where equipment could be 'new' even if not in the original packaging." In those situations, according to the State, "it would likely be impossible to prove a specific expiration date for any such equipment (because that date is typically printed on the packaging)." We find this contention persuasive. The revised language in section 321J.11(1)—adopted in 1986—does not require the State to show that the equipment was in the original factory packaging. So that language cannot be read to require the State to show that any expiration dates on that packaging had not expired before it could satisfy the foundational requirements for admission of the test result.

In interpreting these foundational requirements, we appreciate that "withdrawal of blood from the body of a person accused of a crime for use as evidence in proving the crime is a serious matter." *See Shelton*, 176 N.W.2d at 160. And section 321J.11(1)—like its forerunner at section 321B.4—serves "to assure, so far as reasonably possible, accuracy and reliability of the test and minimize danger of infection to the person undergoing it." *Charlson*, 154 N.W.2d at 835. But to be clear, Miller is not contending that nurse Froehle re-used old equipment. Or that the equipment was not "kept under strictly sanitary and sterile conditions." Indeed, she testified that the swab, syringe, needle, and transfer device were in unopened packages before she used them. Nor is Miller alleging

that she used expired equipment to draw his blood. Rather, he is contending that the State did not offer proof of any expiration dates that may have been on packaging of the equipment taken from the hospital's supply.

The trouble with Miller's contention is that section 321J.11(1) does not mention expiration dates. And superimposing that requirement goes beyond the language used by the legislature. *See State v. Davis*, 922 N.W.2d 326, 330 (Iowa 2019) ("[O]ur primary goal is to give effect to the legislature's intent as expressed in the statute's words."). In short, Miller is asking too much of the word "new." We may not enlarge a statutory term beyond what the legislature adopted. *State v. Childs*, 898 N.W.2d 177, 184 (Iowa 2017). When a proposed interpretation requires us to "read something into the law that is not apparent from the words chosen by the legislature," we must reject it. *Id.* (citation omitted).

It is not apparent from the legislature's use of the word "new" that it expected the State to prove that any expiration dates on the original packaging for the equipment fell after the blood draw. Our case law does not intend that the foundational requirements for admission of the test results be difficult to establish. *See Shelton*, 176 N.W.2d at 161. To that end, the testimony from nurse Froehle showed that the equipment she used satisfied the "basic protections" noted in *Charlson*. *Id.* The district court's acceptance of that testimony as proper foundation did not "dilute the statutory protection afforded [Miller]." *Id.* Because the State offered proper foundation for admission of the test results, that evidence could be considered by the jury.

To recap, neither the suppression claim nor the foundational challenge provide Miller relief.  Thus, we affirm his convictions for homicide by vehicle and serious injury by vehicle under the OWI alternatives.

**AFFIRMED.**